**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| REPAIRIFY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 6:21-cv-00819-ADA |
| | ) | |
| v. | ) | |
| | ) | |
| KEYSTONE AUTOMOTIVE | ) | |
| INDUSTRIES, INC. d/b/a ELITEK | ) | |
| VEHICLE SERVICES, and DOES 1 | ) | |
| through 20, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT'S ANSWER TO COMPLAINT FOR PATENT INFRINGEMENT, DEFENSES, AND COUNTERCLAIMS

Defendant Keystone Automotive Industries, Inc. d/b/a Elitek Vehicle Services ("Elitek"), by and through its attorneys, files this Answer, Defenses, and Counterclaims to Plaintiff Repairify, Inc.'s ("Repairify") Complaint for Patent Infringement dated August 9, 2021 ("Complaint") asserting U.S. Patent Nos. 8,688,313 (the "'313 patent"), 9,684,500 (the "'500 patent"), and 10,528,334 (the "'334 patent"). Elitek's reproduction herein of any material set forth in the Complaint is solely for the purpose of convenience and is not an admission by Elitek that any allegation, statement, or heading, is true, correct, or admitted by Elitek. All allegations in the Complaint that Elitek does not expressly admit or deny below are hereby denied. For responses to particular allegations, Elitek responds as follows:

## THE PARTIES

1.      Plaintiff Repairify, Inc. ("Repairify" or "Plaintiff"), is a Delaware corporation, with its principal place of business at 2600 Technology Drive, Suite 900, Plano, TX 75074.

**RESPONSE:** Elitek is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 1, and therefore denies them.

2.      Upon information and belief, defendant Keystone Automotive Industries, Inc. is a California corporation doing business in this District under the assumed business name of Elitek Vehicle Services ("Elitek").

**RESPONSE:**   Elitek admits that it is a California corporation and that it does business as Elitek

Vehicle Services.  Elitek denies the remaining allegations of Paragraph 2.

3.      Repairify is presently unaware of the true names or capacities, whether they are individuals or business entities, of the defendants identified in the Complaint under the fictitious names Does 1 through 20 (collectively, "Doe Defendants"). Plaintiff will amend its Complaint to identify the names of the Doe Defendants as they and/or the facts underlying their liability are discovered.

**RESPONSE:**   Elitek is without knowledge or information sufficient to form a belief as to the truth

of the allegations of Paragraph 3, and therefore denies them.

4.      At all times mentioned herein, Elitek and the Doe Defendants (collectively, "Defendants"), each and all of them, were authorized and empowered by each other to act, and did so act, as agents of each other, and all of the things herein alleged to have been done by them were done in the capacity of such agency. Upon information and belief, all Defendants are responsible for the events described herein and are liable to Repairify for the damages it has incurred.

**RESPONSE:**   Denied.

## JURISDICTION AND VENUE

5.      This is an action for infringement of a United States Patent, arising under the patent laws of the United States, Title 35 of the United States Code. Jurisdiction is based on 28 U.S.C. §§ 1331 and 1338(a).

**RESPONSE:**   Elitek admits that Repairify purports to bring this action for infringement of a

United States patent arising under the patent laws of the United States, Title 35 of the United States

Code and that this Court has subject matter jurisdiction based on 28 U.S.C. §§ 1331 and 1338(a).

Elitek denies the remaining allegations of Paragraph 5.

6.      United States Patent No. 8,688,313 (the '313 patent issued from the United States Patent and Trademark Office on April 1, 2014 based upon an application (Serial No. 12/977,830, filed December 23, 2010. A true and correct copy of the '313 patent is attached hereto as Exhibit 1 and incorporated by reference.

**RESPONSE:**  Elitek admits that the face of the '313 patent has an issue date of April 1, 2014,

identifies that it is based upon an application with Serial No. 12/977,830, filed on December 23,

2010, and that Exhibit A appears to be a copy of the '313 patent.  Elitek is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 6,

and therefore denies them.

7.    Repairify, Inc. is the owner by assignment of all right, title and interest in and to
the '313 patent.

**RESPONSE:**  Elitek is without knowledge or information sufficient to form a belief as to the truth

of the allegations of Paragraph 7, and therefore denies them.

8.    United States Patent No. 9,684,500 (the '500 patent issued from the United States
Patent and Trademark Office on June 20, 2017 based upon an application (Serial No. 14/219,187,
filed March 19, 2014. A true and correct copy of the '500 patent is attached hereto as Exhibit 2
and incorporated by reference.

**RESPONSE:**  Elitek admits that the face of the '500 Patent has an issue date of June 20, 2017,

identifies that it is based upon an application with Serial No. 14/219,187, filed on March 19, 2014,

and that Exhibit B appears to be a copy of the '500 patent.  Elitek is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 8,

and therefore denies them.

9.    Repairify, Inc. is the owner by assignment of all right, title and interest in and to
the '500 patent.

**RESPONSE:**  Elitek is without knowledge or information sufficient to form a belief as to the truth

of the allegations of Paragraph 9, and therefore denies them.

10.    United States Patent No. 10,528,334 (the '334 patent issued from the United States
Patent and Trademark Office on January 7, 2020 based upon an application (Serial No. 15/619,743,
filed June 12, 2017. A true and correct copy of the '334 patent is attached hereto as Exhibit 3 and
incorporated by reference.

**RESPONSE:**  Elitek admits that the face of the '334 Patent has an issue date of January 7, 2020,

identifies that it is based upon an application with Serial No. 15/619,743, filed on June 12, 2017,

and that Exhibit C appears to be a copy of the '334 patent.  Elitek is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 10,

and therefore denies them.

      11.    Repairify, Inc. is the owner by assignment of all right, title and interest in and to the '334 patent.

**RESPONSE:**  Elitek is without knowledge or information sufficient to form a belief as to the truth

of the allegations of Paragraph 11, and therefore denies them.

      12.    On information and belief, defendant Keystone Automotive Industries, Inc. is a California corporation doing business in this District under the assumed business name of Elitek Vehicle Services ("Elitek"). Upon information and belief, Elitek has at least offered for sale the goods and/or services that Repairify alleges infringe the '313 patent, '500 patent, and '334 patent (collectively the "Asserted Patents") within this District and in this Division.

**RESPONSE:**  Elitek admits that Keystone Automotive Industries, Inc. is a California corporation

doing business in this District under the assumed business name of Elitek Vehicle Services.  Elitek

denies the remaining allegations in Paragraph 12.

      13.    On information and belief, Elitek owns and/or controls multiple vans that are physically present in this District and regularly conduct Elitek's business, as indicated on its website:



**RESPONSE:**  Elitek admits that it owns and/or controls multiple vans that, at times, have been physically present in this District, that conduct business related to mobile diagnostic services. Elitek denies the remaining allegations in Paragraph 13.

14.     Elitek's business includes the provision of mobile diagnostic services in this District, including from locations in Austin, San Antonio, and El Paso. Elitek, on its website, invites customers and potential customers to "find an Elitek service location near [them]":



**RESPONSE:**  Elitek admits that its business offers mobile diagnostic services in this District, including in Austin, San Antonio, and El Paso and that its website has a "Location Finder."  Elitek denies the remaining allegations in Paragraph 14.

15.     On information and belief, Elitek offers its products and services for sale in this District on its website (www.elitekauto.com). That website has a "Location Finder" (https://elitekauto.com/location-finder/) that lists Elitek's regular and established places of business including, inter alia, the following locations: Austin, Texas (offering delivery within 30 miles); San Antonio, Texas (offering delivery within 30 miles); and El Paso, Texas (offering delivery within 30 miles). Elitek's website also lists "Dallas/Fort Worth" as a location offering delivery within 34 miles.

**RESPONSE:**     Elitek admits that it identifies products and services on its website (www.elikteauto.com)  and  that  its  website  has  a  "Location  Finder" (https://elitekauto.com/location-finder/") that identifies Austin, Texas, San Antonio, Texas, El Paso, Texas, and Dallas/Fort Worth.  Elitek denies the remaining allegations in Paragraph 15.

16.     Using the "Location Finder," customers and potential customers can find the following locations, illustrations, and information for Elitek Vehicle Services in El Paso, Texas:



**RESPONSE:**  Elitek admits that the "Location Finder" identifies El Paso, Texas.  Elitek denies the remaining allegations in Paragraph 16.

17.     Using the "Location Finder," customers and potential customers can find the following locations, illustrations, and information for Elitek in San Antonio, Texas:



**RESPONSE:**  Elitek admits that the "Location Finder" identifies San Antonio Texas.  Elitek denies the remaining allegations in Paragraph 17.

18.     Using the "Location Finder," customers and potential customers can find the following locations, illustrations, and information for Elitek Vehicle Services in Austin, Texas:



**RESPONSE:** Elitek admits that the "Location Finder" identifies Austin, Texas.  Elitek denies the remaining allegations in Paragraph 18.

19.    On information and belief, Elitek is operating multiple vans in this District, providing mobile scanning and calibration services. Each such van is regularly operated in the conduct of its business by an employee of Elitek and/or agent of Elitek over whom Elitek has significant control and authorizes to conduct business using Elitek's branding and trademarks.

**RESPONSE:** Elitek admits that it has had multiple vans that are operated in this District.  Elitek denies the remaining allegations in Paragraph 19.

20.    On June 22, 2021, LKQ Corporation and Elitek issued a press release (the "Press Release").  A copy of the Press Release can be read on Elitek's website at: https://elitekauto.com/wp-content/uploads/sites/5/2021/06/Elitek-Remote-Press-Release.pdf.

**RESPONSE:** Admitted.

21.    The Press Release explains that "[s]ince 2019, under the Elite Electronics and VeTech Automotive Electronics brands, LKQ's diagnostic services business, now branded Elitek Vehicle Services ("Elitek"), has grown to become the largest independent provider of mobile, on-site vehicle services to automotive collision repairers, mechanical repairers, and national fleets in the U.S."

**RESPONSE:** Admitted.

22.    Below is a true and correct picture of an Elitek owned and/or controlled van in Austin, Texas, with Texas license plates and listing a telephone number with a 214 area code:



**RESPONSE:** Elitek is without knowledge or information sufficient to form a belief as to the truth

of the allegations of Paragraph 22, and therefore denies them.

23.    The map provided by the Texas Public Utilities Commission on its website (https://www.puc.texas.gov/industry/maps/areacodes/Dallas.aspx), while indicating that the illustration is "not exact," shows that the (214) area code embraces Dallas and a portion of Hill County, within this District and Division:



**RESPONSE:** Elitek is without knowledge or information sufficient to form a belief as to the truth

of the allegations of Paragraph 23, and therefore denies them.

24.    Elitek's website lists its "HEADQUARTERS" as: 1910 Crown Road, Farmers Branch, TX 75234.

**RESPONSE:** Admitted.

25.    On or about January 21, 2021, Keystone Automotive Industries, Inc. ("Keystone") filed an Assumed Business Name Certificate with the Secretary of State, Corporations Division, in Austin, Texas. In that Assumed Business Name Certificate, Keystone indicated that it was or would be doing business under the Assumed Business Name of "Elitek Vehicle Services." The Assumed Business Name Certificate requires a filer to state "[t]he county or counties where business or professional services are being or are to be conducted or rendered under such assumed name;" in response, Keystone indicated "ALL COUNTIES."

**RESPONSE:** Elitek admits that Keystone Automotive Industries, Inc. does business as "Elitek Vehicle Services."   Elitek is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 25, and therefore denies them.

26.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) because Elitek has committed acts of infringement in this District, and has at least a regular and established place of business in this District.

**RESPONSE:**  Denied.

**BRIEF BACKGROUND OF THE PATENTED TECHNOLOGY**

27.     Repairify, including its predecessors in interest, developed technology relating to remote automotive diagnosis and repair.

**RESPONSE:** Elitek is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 27, and therefore denies them.

28.     Most modern automobiles have computerized modules controlling and/or processing and passing data along for a variety of systems and sub-systems in the vehicle. These modules can be accessed via an on-board diagnostic port ("OBD" or "OBD II"). Although the configuration of the OBD port is standardized, the system that various manufacturers, and even certain years, makes, and/or models, utilize to communicate is not. There are currently a variety of communication protocols utilized.

**RESPONSE:**  Elitek admits that most modern automobiles have computerized modules controlling and/or processing and passing data along for a variety of systems and sub-systems in the vehicle, that these modules can be accessed via an on-board diagnostic port ("OBD" or "OBD II"), that the OBD ports are standardized, and that manufacturers may use different communication protocols that may also vary depending on the year, make and model of the vehicle.  Elitek denies the remaining allegations of Paragraph 28.

29.     To diagnose and/or repair automobiles, a technician can connect a vehicle scan tool to the automobile, via a cable to the OBD port. That technician can then utilize the scan tool to read various codes from the modules on the vehicle to perform a diagnosis, via bi-directional communication. If necessary, the technician can also utilize the scan tool connected to the vehicle to re-program and/or re-flash certain modules on the vehicle, using bi-directional communication, as a part of the repair process as a part of the repair process.

**RESPONSE:**  Elitek admits it is possible for a technician to connect a vehicle scan tool to certain automobiles via a cable to an OBD port, that the technician may be able to utilize the scan tool to read certain codes from the vehicle to perform a diagnosis, and that the technician may be able to use a scan tool connected to a vehicle to re-program and/or re-flash certain modules on a vehicle as part of a repair process.  Elitek denies the remaining allegations of Paragraph 29.

30.    Because of the varying communication protocols, it was often necessary for a technician to purchase several different scan tools, each compatible with a particular OBD signal protocol, and in some cases, additional security protocols as well. For example, a technician might need one scan tool for cars manufactured by the Ford Motor Company, and another scan tool for cars manufactured by General Motors. Thus, if a technician wished to service a wide variety of vehicle makes and models, he would often have to make a substantial investment in scan tools. Moreover, because many scan tools are handheld devices that connect directly to a vehicle's data link connector ("DLC"), the technician had to carry out service directly next to, or inside of, the vehicle itself.

**RESPONSE:**   Elitek is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 30, and therefore denies them.

31.    Additionally, there were typically two principal types of scan tools known in the art at the time of the invention. A typical "aftermarket" scan tool had limited capability, only being capable of interfacing with certain modules and sub-systems, such as the engine control module and transmission control module, for purposes of maintaining proper fuel efficiency and emissions, and often lacked coverage of the newest vehicles.

**RESPONSE:**  Elitek is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 31, and therefore denies them.

32.    A manufacturer-specific scan tool, on the other hand, is a scan tool designed to interface with all of the modules and sub-systems found within a vehicle and provides the ability to read, analyze, manipulate, program and reprogram such modules and sub-systems. Of course, the manufacturer-specific scan tools are much more expensive to own and maintain. For one, the scan tool hardware and software themselves were more expensive, but also, the manufacturer-specific scan tools required daily, weekly, or monthly software updates in order to take advantage of the latest programming software. Accordingly, if a technician wished to offer a full range of services for a particular vehicle manufacturer, he would have to purchase the expensive manufacturer-specific scan tool and a subscription so that he can obtain the latest software updates.

**RESPONSE**:   Elitek is without knowledge or information sufficient to form a belief as to the

truth of the allegations of Paragraph 32, and therefore denies them.

### REPAIRIFY'S DEVELOPMENT OF THE PATENTED TECHNOLOGY

33.     Repairify, including its predecessors, saw a need in the art for a system and method that allowed a technician to service and program a vehicle, through its ODB interface, from a remote location. And the benefits of a system and method for programming a vehicle that does not require a shop or garage to purchase numerous expensive scan tools for each specific vehicle make and/or model.

**RESPONSE:**  Elitek is without knowledge or information sufficient to form a belief as to the truth

of the allegations of Paragraph 33, and therefore denies them.

34.     Repairify, including its predecessors, therefore developed such a system, including a remote call center that has the capabilities to diagnose and program a wide variety of vehicles implementing a wide variety of OBD communication protocols using the most recent scan tool software for a wide variety of vehicle manufactures and model years.

**RESPONSE:**  Elitek is without knowledge or information sufficient to form a belief as to the truth

of the allegations of Paragraph 34, and therefore denies them.

35.     Repairify therefore developed and commercially deployed just such a system.

**RESPONSE:**  Elitek is without knowledge or information sufficient to form a belief as to the truth

of the allegations of Paragraph 35, and therefore denies them.

36.     Repairify also filed patent applications, seeking to protect its innovations, including U.S. Patent Application Serial No. 12/977,830, filed December 23, 2010. That application issued as the '313 patent which, like all of the Asserted Patents, claims priority to that initial patent application.

**RESPONSE:**  Elitek admits that the face of the '313 patent identifies the application number as

12/977,830 and that the faces of the '500 and '334 patents reference as "Related U.S. Application

Data" the application number 12/977,830.  Elitek denies the remaining allegations of Paragraph

36.

37.     All of the Asserted Patents were properly and duly issued by the United States Patent and Trademark Office. All of the asserted patents have been duly maintained and remain in full force and effect.

**RESPONSE:**  Denied.

38.     Repairify has expended substantial resources researching and developing its patented technologies, technical strategies, and business plans related to its remote automobile scanning and programming business, through the expenditure of considerable employee work hours and company resources. This research and development has led to numerous innovative products in the remote automobile scanning and programming market. The United States Patent and Trademark Office has recognized Repairify's achievements by awarding several patents to Repairify and its inventors as a result of these innovations. Repairify has also been granted additional patents on its technology, including foreign counterparts to the Asserted Patents, which have been properly and duly issued in Canada, Mexico, Brazil, Japan, and Australia.

**RESPONSE:**  Elitek is without knowledge or information sufficient to form a belief as to the truth

of the allegations of Paragraph 38, and therefore denies them.

### SOME OF DEFENDANT'S ACTIVITIES GIVING RISE TO THIS ACTION

39.     The title of the Press Release reads, in part: "Elitek® Vehicle Services Business Announces Further Expansion into Remote Automotive Diagnostics and Programming" (emphasis in original).

**RESPONSE:**  Elitek admits that the text "Elitek® Vehicle Services Business Announces Further

Expansion into Remote Automotive Diagnostics and Programming" can be found in the Press

Release.  Elitek denies the remaining allegations of Paragraph 39.

40.     The Press Release states: "Effective today, Elitek is expanding its services beyond on-site mobile diagnostics and repair to also include remote automotive diagnostics and remote programming" (emphasis in original). It continues, in part "Shop technicians can plug-in an OBDII device that remotely connects the vehicle to Elitek's call center. The technician, with support from a centralized Elitek diagnostician, conducts the diagnostic scan(s), produces a scan report, enables remote programming where applicable, and invoices for the service."

**RESPONSE:**  Elitek admits that the text "Effective today, Elitek is expanding its services beyond

on-site mobile diagnostics and repair to also include remote automotive diagnostics and remote

programming" and "Shop technicians can plug-in an OBDII device that remotely connects the

vehicle to Elitek's call center. The technician, with support from a centralized Elitek diagnostician,

conducts the diagnostic scan(s), produces a scan report, enables remote programming where applicable, and invoices for the service" can be found in the Press Release.  Elitek denies the remaining allegations of Paragraph 40.

41.     On information and belief, LKQ North America sales and marketing Vice President Terry Fortner has stated that "the device can connect to either a remote OEM or aftermarket scan tool," and written "we use OEM tooling as the recommended and primary tool."

**RESPONSE:**  Elitek is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 41, and therefore denies them.

42.     On information and belief, Fortner has stated that the addition of mobile services is intended to reach "customers, including those outside of our current mobile servicing locations . . . [w]ith the addition of remote services, we can be more responsive to a broader range of customers." On information and belief, Fortner has indicated that Elitek's remote service will "give [collision repair shops] the option of plugging an 'EVS' device into their customer's OBD-II port and having Elitek examine the vehicle at an offsite call center."

**RESPONSE:**  Elitek is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 42, and therefore denies them.

43.     As of July 30, 2021, Elitek's website had a page explaining its "Services," including "Remote," at: https://elitekauto.com/services/remote/ (the "Elitek Remote Services Webpage").

**RESPONSE:**  Elitek admits that its website has a page at https://eliteukauto.com/services/remote/. Elitek is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 43, and therefore denies them.

44.     The Elitek's Remote Services Webpage provides, in part, the below image showing the Elitek Vehicle Services remote device ("EVS Plug-in Device") and information:



**RESPONSE:**  Admitted.

45.    The Elitek Remote Services Webpage provides, in part, the below image and information:



**RESPONSE:**  Admitted.

46.    The Elitek Remote Services Webpage includes a short video, entitled "Elitek Remote Device Breakdown" (the "Video"). The Video below screen image is taken from the Video:



**RESPONSE:**  Elitek admits that the Elitek Remote Services Webpage includes a video entitled "Elitek Remote Device Breakdown."  Elitek is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 46, and therefore denies them.

47.    The Video shows that the board of Elitek's EVS Plug-in Device is nearly identical to that of Repairify's asTech Remote Diagnostic Device.

**RESPONSE:**  Elitek is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 47, and therefore denies them.

48.    The Video includes the below image, advertising that Elitek's EVS Plug-in Device is capable of transmitting data over the internet via a wired option or WiFi:



**RESPONSE:**  Elitek admits that the Elitek Remote Services Webpage includes a video entitled "Elitek Remote Device Breakdown" which includes a depiction of an Elitek EVS Plug-in Device that includes the label "Integrated WiFi Module."  Elitek denies the remaining allegations of Paragraph 48.

49.    DoIP, in the automotive industry, stands for Diagnostics over Internet Protocol. The Video includes the below image, advertising that Elitek's EVS Plug-in Device is DoIP Ready:"



**RESPONSE:**  Admitted.

## COUNT I
## Infringement of U.S. Patent No. 8,688,313
## Against Elitek and DOES 1 to 20

50.    Plaintiff realleges Paragraphs 1 through 49, inclusive.

**RESPONSE:**  Elitek restates and incorporates by reference each of its responses to the allegations

in Paragraphs 1-49 as if fully set forth herein.

51.    Defendants have directly infringed and are currently directly infringing, induced others to infringe and continued to induce others to infringe, and/or have committed and continue to commit acts of contributory infringement, literally or under the doctrine of equivalents, one or more claims of the '313 patent. Defendants' infringing activities in the United States and this District include importing, making, using, selling, and/or offering for sale, and/or importing into the United States and this District, without license, permission, and/or authority, products, equipment and/or services, including but not limited to Elitek's EVS Plug-in Device and Remote Service, that infringe one or more claims of the '313 patent, including but not limited to the below identified claims, and contributing to, and inducing consumers and users to make and/or use the patented invention(s) and/or to practice the claimed system and/or methods.

**RESPONSE:**  Denied.

52.    Specifically, on information and belief, Elitek induces others, including its customers and end-users, to infringe at least claim 1 of the '313 patent by encouraging and facilitating them to perform actions known by Elitek to infringe and with the intent that performance of the actions will infringe. Elitek has been aware of the '313 patent since at least the filing of this complaint.

**RESPONSE:**  Denied.

53.    On information and belief, Elitek induces consumers, including its customers and end-users, to make and use the claimed inventions and to practice the claimed methods by: (i) providing customers with the EVS Plug-in Device; (ii) instructing consumers to plug the EVS Plug-in Device into the OBD port of a vehicle to be scanned/reprogrammed; and (iii) instructing customers to then contact Elitek and utilize Elitek's equipment and/or services such that the combination as intended practices each of the elements of at least one claim of the '313 patent, including but not limited to those specifically discussed below.

**RESPONSE:**  Denied.

54.     On information and belief, consumers make and use the claimed inventions and practice the claimed methods by using Elitek's products and/or services, including but not limited to those identified above, that incorporate Elitek's EVS Plug-in Device, the Elitek Remote Service, and/or actions taken by the customers that assist in establishing communication, thereby directly infringing at least the claims of the '313 patent discussed below.

**RESPONSE:**  Denied.

55.     Elitek also contributes to the infringement of the '313 patent because Elitek knows that Elitek's EVS Plug-in Device and Remote Service are made for use in an infringing manner and are not staple articles of commerce suitable for substantial non-infringing uses. Elitek's EVS Plug-in Device and/or the Elitek Remote Service, which it offers for sale and sells directly to its customers are designed to be used (and are used by customers and end-users) in an infringing manner.

**RESPONSE:**  Denied.

56.     On information and belief, Elitek's EVS Plug-in Device and Remote Service are especially designed, made, or adapted for use in an infringing manner. Elitek's EVS Plug-in Device and Remote Service have no substantial non-infringing uses and are material to the claimed inventions.

**RESPONSE:**  Denied.

57.     As just one non-limiting example, set forth below are the elements of Claim 1 of the '313 patent, which is an exemplary claim, followed by narrative and/or illustrative information regarding Elitek's EVS Plug-in Device and Remote Service presently available from publicly available information. The claims have not yet been construed, nor has Repairify been provided with detailed information it expects to obtain in discovery. Repairify reserves the right to amend and/or modify this information.

**RESPONSE:**  Denied.

58.     The preamble of Claim 1 of the '313 patent recites: "A system for remotely programming one or more sub-systems of a vehicle, comprising:"

**RESPONSE:**  Admitted.

59.     Elitek's EVS Plug-in Device and Remote Service comprise a system for, inter alia, remotely programming one or more sub-systems of a vehicle.

**RESPONSE:**  Denied.

60.     The first element of Claim 1 of the '313 patent recites: "a vehicle connector having a plurality of pins, said pins in communication with a said one or more sub-systems;"

**RESPONSE:**  Admitted.

61.    Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a vehicle connector having a plurality of pins, and those pins are in communication with one or more sub-systems of a vehicle, as illustrated in part by the below image from the Elitek Remote Services Webpage:



**RESPONSE:**  Denied.

62.    The next portion of Claim 1 of the '313 patent recites: "a vehicle communication device connected to said vehicle connector;"

**RESPONSE:**  Admitted.

63.    Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a vehicle communication device connected to the vehicle connector, as illustrated in part by the below image from the Elitek Remote Services Webpage:



**RESPONSE:**  Denied.

64.    The next portion of Claim 1 of the '313 patent recites: "a bi-directional communication link between said vehicle communication device and a remote communication device;"

**RESPONSE:**  Admitted.

65.    Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a bi-directional communication link between the vehicle communication device and a remote communication device, such as an OEM or after market scan tool, such that the vehicle communication device can send communications to the scan tool, and the scan tool can send communications to the vehicle communication device.

**RESPONSE:**  Denied.

66.    The next portion of Claim 1 of the '313 patent recites: "a computer system connected to said remote communication device;"

**RESPONSE:** Admitted.

67.    Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a computer system connected to said remote communication device, as illustrated in part by the below image from the Elitek Remote Services Webpage:



**Call Center Technician**

- Starts/completes the pre-post/remote scan procedure
- Communicates with the customer through a process

**RESPONSE:**  Denied.

68.    The next portion of Claim 1 of the '313 patent recites: "wherein said vehicle communication device is configured to: receive one or more outgoing pin signals present on said pins, said pin signals containing data corresponding to one or more said sub-systems;"

**RESPONSE:**  Admitted.

69.    On information and belief, Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a vehicle communication device that is configured to receive one or more outgoing pin signals present on the pins, and those pin signals contain data corresponding to one or more sub-systems of a vehicle.

**RESPONSE:**  Denied.

70.     The next portion of Claim 1 of the '313 patent recites: "convert said one or more outgoing pin signals to a network-compatible vehicle packet;"

**RESPONSE:**  Admitted.

71.     On information and belief, Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a vehicle communication device that is configured to convert one or more outgoing pin signals to a network-compatible vehicle packet.

**RESPONSE:**  Denied.

72.     The next portion of Claim 1 of the '313 patent recites: "transmit said vehicle packet to said remote communication device over said bi-directional communication link;"

**RESPONSE:**  Admitted.

73.     On information and belief, Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a vehicle communication device that is configured to transmit a network-compatible vehicle packet over a bi-directional communication link.

**RESPONSE:**  Denied.

74.     The next portion of Claim 1 of the '313 patent recites: "wherein said remote communication device is configured to: re-convert said vehicle packet to said one or more outgoing pin signals;"

**RESPONSE:**  Admitted.

75.     On information and belief, Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a remote communication device that is configured to re-convert said vehicle packet to said one or more outgoing pin signals.

**RESPONSE:**  Denied.

76.     The next portion of Claim 1 of the '313 patent recites: "and transmit said one or more outgoing pin signals to said computer system;"

**RESPONSE:**  Admitted.

77.     On information and belief, Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a remote communication device configured to transmit one or more outgoing pin signals to the computer system.

**RESPONSE:**  Denied.

78.     The next portion of Claim 1 of the '313 patent recites: "and wherein said computer system and said vehicle connector are engaged in continuous bi-directional communication using a standard OBD communications protocol;"

**RESPONSE:**  Admitted.

79.     On information and belief, Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a computer system and a vehicle connector that engage in continuous bi-directional communication using a standard OBD communications protocol.

**RESPONSE:**  Denied.

80.     The next portion of Claim 1 of the '313 patent recites: "and wherein said computer system is enabled by said continuous bi-directional communication using a standard OBD communications protocol to actively and continuously communicate with, scan and program said sub-systems as if it were located proximate to said vehicle."

**RESPONSE:**  Admitted.

81.     On information and belief, Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a computer system that is enabled by continuous bi-directional communication using a standard OBD communications protocol to actively and continuously communicate with, scan and program a vehicle's sub-systems as if it were located proximate to that vehicle.

**RESPONSE:**  Denied.

82.     Claim 5 of the '313 patent recites: "The system of claim 1, wherein said computer system is a vehicle scan tool."

**RESPONSE:**  Admitted.

83.     Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a computer system that is a vehicle scan tool, either OEM or after market.

**RESPONSE:**  Denied.

84.     Claim 6 of the '313 patent recites: "The system of claim 1, wherein said bi-directional communication link is carried over the Internet."

**RESPONSE:**  Admitted.

85.     Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a system in which the bi-directional communication link between the vehicle communication device and the remote device is carried over the Internet.

**RESPONSE:**  Denied.

86.     On information and belief, Defendants' direct, induced, and/or contributory infringement of the '313 patent has caused and continues to cause substantial damage to Repairify.

**RESPONSE:**  Denied.

**COUNT II**
**Infringement of U.S. Patent No. 9,684,500**
**Against Elitek and DOES 1 to 20**

87.     Plaintiff realleges Paragraphs 1 through 86, inclusive.

**RESPONSE:**  Elitek restates and incorporates by reference each of its responses to the allegations

in Paragraphs 1-86 as if fully set forth herein.

88.     Defendants have directly infringed and are currently directly infringing, induced others to infringe and continued to induce others to infringe, and/or have committed and continue to commit acts of contributory infringement, literally or under the doctrine of equivalents, one or more claims of the '500 patent. Defendants' infringing activities in the United States and this District include importing, making, using, selling, and/or offering for sale, and/or importing into the United States and this District, without license, permission, and/or authority, products, equipment and/or services, including but not limited to Elitek's EVS Plug-in Device and Remote Service, that infringe one or more claims of the '500 patent, including but not limited to the below identified claims, and contributing to, and inducing consumers and users to make and/or use the patented invention(s) and/or to practice the claimed system and/or methods.

**RESPONSE:**  Denied.

89.     Specifically, on information and belief, Elitek induces others, including its customers and end-users, to infringe at least claim 1 of the '500 patent by encouraging and facilitating them to perform actions known by Elitek to infringe and with the intent that performance of the actions will infringe. Elitek has been aware of the '500 patent since at least the filing of this complaint.

**RESPONSE:**  Denied.

90.     On information and belief, Elitek induces consumers, including its customers and end-users, to make and use the claimed inventions and to practice the claimed methods by: (i) providing customers with Elitek's EVS Plug-in Device; (ii) instructing consumers to plug the EVS Plug-in Device into the OBD port of a vehicle to be scanned/reprogrammed; and (iii) instructing customers to then contact Elitek and utilize Elitek's equipment and/or services such that the combination as intended practices each of the elements of at least one claim of the '500 patent, including but not limited to those specifically discussed below.

**RESPONSE:**  Denied.

91.     On information and belief, consumers make and use the claimed inventions and practice the claimed methods by using Elitek's products and/or services, including but not limited to those identified above, that incorporate Elitek's EVS Plug-in Device, the Elitek Remote Service, and/or actions taken by the customers that assist in establishing communication, thereby directly infringing at least the claims of the '500 patent discussed below.

**RESPONSE:**  Denied.

92.     Elitek also contributes to the infringement of the '500 patent because Elitek knows that Elitek's EVS Plug-in Device and Remote Service are made for use in an infringing manner and are not staple articles of commerce suitable for substantial non-infringing uses. Elitek's EVS Plug-in Device and/or the Elitek Remote Service, which it offers for sale and sells directly to its customers are designed to be used (and are used by customers and end-users) in an infringing manner.

**RESPONSE:**  Denied.

93.     On information and belief, Elitek's EVS Plug-in Device and Elitek Remote Service are especially designed, made, or adapted for use in an infringing manner. Elitek's Remote Device and Remote Service have no substantial non-infringing uses and are material to the claimed inventions.

**RESPONSE:**  Denied.

94.     As just one non-limiting example, set forth below are the elements of Claim 1 of the '500 patent, which is an exemplary claim, followed by narrative and/or illustrative information regarding Elitek's EVS Plug-in Device and Remote Service presently available from publicly available information. The claims have not yet been construed, nor has Repairify been provided with detailed information it expects to obtain in discovery. Repairify reserves the right to amend and/or modify this information.

**RESPONSE:**  Denied.

95.     The preamble of Claim 1 of the '500 patent recites: "A system for remotely programming a subsystem of a subject vehicle, comprising:"

**RESPONSE:**  Admitted.

96.     Elitek's EVS Plug-in Device and Remote Service comprise a system for, inter alia, remotely programming a sub-system of a vehicle.

**RESPONSE:**  Denied.

97.     The first portion of Claim 1 of the '500 patent recites: "a first communication device located proximate to a subject vehicle comprising:"

**RESPONSE:**  Admitted.

98.    Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a first communication device located proximate to the vehicle to be scanned/programmed, as illustrated in part by the below image from the Elitek Remote Services Webpage:



**RESPONSE:**  Denied.

99.    The next portion of Claim 1 of the '500 patent recites: "a first interface that interfaces with a vehicle computer system for the subject vehicle and providing bi-directional communication with the vehicle computer system using a standard OBD communications protocol;"

**RESPONSE:**  Admitted.

100.    Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a communication device that has an interface that interfaces with a vehicle computer system for the vehicle to be scanned and/or programmed that provides bi-directional communication with the vehicle computer system using a standard OBD communications protocol.

**RESPONSE:**  Denied.

101.    The next portion of Claim 1 of the '500 patent recites: "a second interface that interfaces with a communication network;"

**RESPONSE:**  Admitted.

102.    Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a communication device that has a number of interfaces other than the cable that connects it to the vehicle, that interface with a communication network, including but not limited to the wired internet connection and the WiFi connection.

**RESPONSE:**  Denied.

103.    The next portion of Claim 1 of the '500 patent recites: "and a first communication processor that controls communications over the first and second interfaces;"

**RESPONSE:**  Admitted.

104.   Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a communication device that has a communication processor that controls communications over the interface that communicates with the vehicle and the interface(s) that communicate with the remote device.

**RESPONSE:**  Denied.

105.   The next portion of Claim 1 of the '500 patent recites: "and a second communication device located remotely from the subject vehicle comprising;"

**RESPONSE:**  Admitted.

106.   On information and belief, Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a communication device located remotely from the vehicle to be scanned/programmed.

**RESPONSE:**  Denied.

107.   The next portion of Claim 1 of the '500 patent recites: "a third interface that interfaces with the communication network, the communication network providing a bi-directional communication link between the first communication device and the second communication device;"

**RESPONSE:**  Admitted.

108.   On information and belief, Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a communication device located remotely from the vehicle to be scanned/programmed ("Remote Device") that has an interface that interfaces with the communication network, and that communication network provides a bi-directional communication link between the communication device connected to the vehicle and the Remote Device.

**RESPONSE:**  Denied.

109.   The next portion of Claim 1 of the '500 patent recites: "a fourth interface that interfaces with a vehicle scan tool located proximate to the second communication device;"

**RESPONSE:**  Admitted.

110.   On information and belief, Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a communication device located remotely from the vehicle to be scanned/programmed that has an interface that interfaces with a vehicle scan tool located proximate to the second communication device.

**RESPONSE:**  Denied.

111.    The next portion of Claim 1 of the '500 patent recites: "and a second communication processor that controls communications over the third and fourth interfaces,"

**RESPONSE:**  Admitted.

112.    On information and belief, Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a communication device located remotely from the vehicle to be scanned/programmed ("Remote Device") that has a communication processor that controls communications over that device's interfaces with both: a) the communication network connecting Remote Device to the communication device located proximate to the vehicle to be scanned/programmed; and b) the interface that permits it to communicate with the vehicle scan tool.

**RESPONSE:**  Denied.

113.    The next portion of Claim 1 of the '500 patent recites: "wherein the second communication processor is enabled to: Request, from the vehicle computer system over the bi-directional communication link, one or more outdoing pin signals the vehicle sub-system;"

**RESPONSE:**  Admitted.

114.    On information and belief, Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a communication device located remotely from the vehicle to be scanned/programmed that has a communication processor that is enabled to request, from the computer system of the vehicle to be scanned/programmed, over the bi-directional communication link, one or more outgoing pin signals from a vehicle sub-system.

**RESPONSE:**  Denied.

115.    The next portion of Claim 1 of the '500 patent recites: "Receive, over the bi-directional communication link, a network-compatible vehicle packet corresponding to the outgoing pin signal;"

**RESPONSE:**  Admitted.

116.    On information and belief, Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a communication device located remotely from the vehicle to be scanned/programmed that has a communication processor that is enabled to receive, over the bi-directional communication link, a network-compatible vehicle packet corresponding to the outgoing pin signal.

**RESPONSE:**  Denied.

117.    The next portion of Claim 1 of the '500 patent recites: "Convert the vehicle packet to said one or more outgoing pin signals;"

**RESPONSE:**  Admitted.

118.    On information and belief, Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a communication device located remotely from the vehicle to be scanned/programmed that has a communication processor that is enabled to convert a vehicle packet received over the internet to one or more outgoing pin signals.

**RESPONSE:**  Denied.

119.    The next portion of Claim 1 of the '500 patent recites: "and Transmit the one or more outgoing pin signals to the vehicle scan tool;"

**RESPONSE:**  Admitted.

120.    On information and belief, Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a communication device located remotely from the vehicle to be scanned/programmed that has a communication processor that is enabled to transmit the one or more outgoing pin signals to the vehicle scan tool.

**RESPONSE:**  Denied.

121.    The next portion of Claim 1 of the '500 patent recites: "wherein the first communication device and the second communication device provide communication between the vehicle scan tool and the vehicle computer system to enable the vehicle scan tool to scan and program a vehicle sub-system of the subject vehicle as if the vehicle scan tool were located proximate to the subject vehicle."

**RESPONSE:**  Admitted.

122.    On information and belief, Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a communication device located remotely from the vehicle to be scanned/programmed ("Remote Device") and another communication device located proximate to the vehicle and connected to it via a cable to its on-board diagnostics port that provide communication between a vehicle scan tool and the vehicle's computer system to enable the vehicle scan tool to scan and program a vehicle sub-system of that vehicle as if the vehicle scan tool were located proximate to the that vehicle.

**RESPONSE:**  Denied.

123.    Claim 3 of the '500 patent recites: "The system of claim 1, wherein the bi-directional communication link comprises the Internet."

**RESPONSE:**  Admitted.

124.     Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a system in which the bi-directional communication link between the vehicle-proximate communication device and the remote communication device is carried over the Internet.

**RESPONSE:**  Denied.

125.     On information and belief, Defendants' direct, induced, and/or contributory infringement of the '500 patent has caused and continues to cause substantial damage to Repairify.

**RESPONSE:**  Denied.

**COUNT III**
**Infringement of U.S. Patent No. 10,528,334**
**Against Elitek and DOES 1 to 20**

126.     Plaintiff realleges Paragraphs 1 through 125, inclusive.

**RESPONSE:**  Elitek restates and incorporates by reference each of its responses to the allegations

in Paragraphs 1-125 as if fully set forth herein.

127.     Defendants have directly infringed and are currently directly infringing, induced others to infringe and continued to induce others to infringe, and/or have committed and continue to commit acts of contributory infringement, literally or under the doctrine of equivalents, one or more claims of the '334 patent. Defendants' infringing activities in the United States and this District include importing, making, using, selling, and/or offering for sale, and/or importing into the United States and this District, without license, permission, and/or authority, products, equipment and/or services, including but not limited to Elitek's EVS Plug-in Device and Remote Service, that infringe one or more claims of the '334 patent, including but not limited to the below identified claims, and contributing to, and inducing consumers and users to make and/or use the patented invention(s) and/or to practice the claimed system and/or methods.

**RESPONSE:**  Denied.

128.     Specifically, on information and belief, Elitek induces others, including its customers and end-users, to infringe at least claim 1 of the '334 patent by encouraging and facilitating them to perform actions known by Elitek to infringe and with the intent that performance of the actions will infringe. Elitek has been aware of the '334 patent since at least the filing of this complaint.

**RESPONSE:**  Denied.

129.     On information and belief, Elitek induces consumers, including its customers and end-users, to make and use the claimed inventions and to practice the claimed methods by: (i) providing customers with Elitek's EVS Plug-in Device ; (ii) instructing consumers to plug the EVS Plug-in Device into the OBD port of a vehicle to be scanned/reprogrammed; and (iii) instructing

30

customers to then contact Elitek and utilize Elitek's equipment and/or services such that the combination as intended practices each of the elements of at least one claim of the '334 patent, including but not limited to those specifically discussed below.

**RESPONSE:**  Denied.

130.    On information and belief, consumers make and use the claimed inventions and practice the claimed methods by using Elitek's products and/or services, including but not limited to those identified above, that incorporate Elitek's EVS Plug-in Device, the Elitek Remote Service, and/or actions taken by the customers that assist in establishing communication, thereby directly infringing at least the claims of the '334 patent discussed below.

**RESPONSE:**  Denied.

131.    Elitek also contributes to the infringement of the '334 patent because Elitek knows that Elitek's EVS Plug-in Device and Remote Service are made for use in an infringing manner and are not staple articles of commerce suitable for substantial non-infringing uses. Elitek's EVS Plug-in Device and/or the Elitek Remote Service, which it offers for sale and sells directly to its customers are designed to be used (and are used by customers and end-users) in an infringing manner.

**RESPONSE:**  Denied.

132.    On information and belief, Elitek's EVS Plug-in Device and Elitek Remote Service are especially designed, made, or adapted for use in an infringing manner. Elitek's EVS Plug-in Device and Remote Service have no substantial non-infringing uses and are material to the claimed inventions.

**RESPONSE:**  Denied.

133.    As just one non-limiting example, set forth below are the elements of Claim 1 of the '334 patent, which is an exemplary claim, followed by narrative and/or illustrative information regarding Elitek's EVS Plug-in Device and Remote Service presently available from publicly available information. The claims have not yet been construed, nor has Repairify been provided with detailed information it expects to obtain in discovery. Repairify reserves the right to amend and/or modify this information.

**RESPONSE:**  Denied.

134.    The preamble of Claim 1 of the '334 patent recites: "A method for remotely programming a sub-system of a subject vehicle, comprising:"

**RESPONSE:**  Admitted.

135.    Elitek's EVS Plug-in Device and Remote Service comprise a system and method for, inter alia, remotely programming a sub-system of a vehicle.

**RESPONSE:**  Denied.

136.    The first element of Claim 1 of the '500 patent recites: "establishing, by a first communication device located proximate to a vehicle scan tool and comprising a first communication device processor, a bi-directional communication link with a second communication device over a communication network, the second communication device located proximate to a subject vehicle and remote from the first communication device;"

**RESPONSE:**  Admitted.

137.    Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a system that includes a communication device located proximate to a vehicle scan tool that has a processor and establishing a bi-directional communication link between that communication device and another communication device located remotely from the first device, proximate to the vehicle to be scanned/programmed.

**RESPONSE:**  Denied.

138.    The next portion of Claim 1 of the '500 patent recites: "requesting, by the first communication device, over the bi-directional communication link and via the second communication device, an outgoing pin signal from a vehicle sub-system for the subject vehicle;"

**RESPONSE:**  Admitted.

139.    Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a system that practices the method including the step of the communication device located proximate to a vehicle scan tool requesting, over the bi-directional communication link and via the second communication device located proximate to the vehicle, an outgoing pin signal from a vehicle sub-system for the subject vehicle.

**RESPONSE:**  Denied.

140.  The next portion of Claim 1 of the '500 patent recites: "receiving, by the first communication device, over the bi-directional communication link, a network-compatible vehicle packet corresponding to the outgoing pin signal; converting, by the first communication device, the vehicle packet to the outgoing pin signal;"

**RESPONSE:**  Admitted.

141.  Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a system that practices the method including the step of the communication device located proximate to the vehicle scan tool receiving, over the bi-directional communication link, a network-compatible vehicle packet corresponding to the outgoing pin signal.

**RESPONSE:**  Denied.

142. The next portion of Claim 1 of the '500 patent recites: "converting, by the first communication device, the vehicle packet to the outgoing pin signal;"

**RESPONSE:**  Admitted.

143. On information and belief, Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a system that practices the method including the step of the communication device located proximate to the vehicle scan tool converting a network compatible vehicle packet it has received to an outgoing pin signal.

**RESPONSE:**  Denied.

144. The next portion of Claim 1 of the '500 patent recites: "and communicating, by the first communication device, the outgoing pin signal to the vehicle scan tool;"

**RESPONSE:**  Admitted.

145. On information and belief, Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a system that practices the method including the step of the communication device located proximate to the vehicle scan tool communicating the outgoing pin signal to the vehicle scan tool.

**RESPONSE:**  Denied.

146. The next portion of Claim 1 of the '500 patent recites: "wherein the first communication device and the second communication device provide communication between the vehicle scan tool and the vehicle sub-system to enable the vehicle scan tool to scan and program the vehicle sub-system of the subject vehicle as if the vehicle scan tool were located proximate to the subject vehicle."

**RESPONSE:**  Admitted.

147.   On information and belief, Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a system that practices the method including the step of the communication device located proximate to the vehicle scan tool and the second communication device located proximate to the vehicle to be scanned/programmed providing communication between a vehicle scan tool and vehicle sub-systems to enable the vehicle scan tool to scan and program the vehicle sub-system of the subject vehicle as if the vehicle scan tool were located proximate to the subject vehicle.

**RESPONSE:**  Denied.

148.   Claim 2 of the '334 patent recites: "The method of claim 1, wherein the bi-directional communication link comprises the Internet."

**RESPONSE:**  Admitted.

149.    Elitek's EVS Plug-in Device and Remote Service comprise, inter alia, a system in which the bi-directional communication link between the communication device proximate the vehicle scan tool and the communication device located proximate the vehicle is carried, at least in part, over the Internet.

**RESPONSE:**  Denied.

150.    On information and belief, Defendants' direct, induced, and/or contributory infringement of the '334 patent has caused and continues to cause substantial damage to Repairify.

**RESPONSE:**  Denied.

## RESPONSE TO PRAYER AND DEMAND FOR JURY TRIAL

To the extent Repairify's prayer and demand for jury trial contain any allegations and/or averments, Elitek denies them and denies that Repairify is entitled to any of the requested relief.

## ELITEK'S DEFENSES

Further answering the Complaint, Elitek asserts the following defenses without assuming any burden of proof when such burden would otherwise be on Repairify as a matter of law.

## FIRST DEFENSE

### (Non-Infringement)

Elitek does not and has not infringed, either literally or under the doctrine of equivalents, directly or indirectly, any valid and enforceable claim of the Asserted Patents asserted by Repairify.  *See, e.g.,* Elitek's Motion to Dismiss filings (Dkt. Nos. 23, 24, 28, 29), which are hereby incorporated by reference.

## SECOND DEFENSE

### (Invalidity)

One or more of the asserted claims of the Asserted Patents are invalid for failure to meet the requirements of the U.S. patent laws, 35 U.S.C. §§ 101, *et. seq.*, including but not limited to 35 U.S.C. §§ 101, 102, 103, and 112.  *See, e.g.,* Elitek's Preliminary Invalidity Contentions served upon Repairify on February 14, 2022, which are hereby incorporated by reference.

**THIRD DEFENSE**

(Prosecution History Disclaimer and Estoppel)

By reasons of statements, representations, concessions, arguments, or amendments, whether explicit or implicit, made by or on behalf of the patentee during prosecution of the applications that led to the issuance of the Asserted Patents and related applications, Repairify's claims of patent infringement are barred in whole or in part by the doctrines of prosecution history disclaimer and prosecution history estoppel. *See, e.g.,* Elitek's briefing on claim construction (Dkt. Nos. 37, 38, 39, 42, 43), which are hereby incorporated by reference.

**FOURTH DEFENSE**

(Equitable Defenses)

Repairify's claims for relief are barred, in whole or in part, by the doctrines of equitable estoppel, unclean hands, waiver, acquiescence, disclaimer and/or other equitable doctrines.

**FIFTH DEFENSE**

(Limitation on Damages, Costs, and Expenses)

Any potential recovery, including, but not limited to, enhanced damages, attorney's fees, costs, and expenses, is barred, in whole or in part, by one or more of 35 U.S.C. §§ 284-288. In addition, Repairify is not entitled to a finding that this case is exceptional or to any recovery pursuant to the Court's inherent powers.

**SIXTH DEFENSE**

(Unavailability of Injunctive Relief)

Repairify is not entitled to injunctive relief (preliminary or permanently) because there exists an adequate remedy at law, Repairify has not suffered irreparable harm, and Repairify's claims otherwise fail to meet the requirements for such relief.

**SEVENTH DEFENSE**

(Failure to State a Claim)

The Complaint fails to state a claim upon which relief may be granted.

**EIGTH DEFENSE**

(Improper and Inconvenient Venue)

Venue in this District is improper pursuant to 28 U.S.C. § 1400 and inconvenient pursuant to 28 U.S.C. § 1404.

**NINTH DEFENSE**

(Unenforceability of the '313 Patent Due to Inequitable Conduct)

The claims of the '313 patent are unenforceable because of material misrepresentations to the United States Patent and Trademark Office ("PTO") during the prosecution of the '313 patent made with the specific intent to deceive the PTO. But for material misrepresentations, the PTO would not have issued the '313 patent.

Statements Made to the PTO. On December 23, 2010, the patentee filed U.S. Patent Application No. 12/977,830 ("the '830 application"), which would eventually issue as the '313 patent. The application data sheet was signed by attorney Ury Fischer. On December 5, 2012, the PTO issued an Office Action rejecting the pending claims of the '830 application as being unpatentable over several prior art references, including U.S. Patent No. 6,728,603 ("Pruzan").

On May 30, 2013, Fischer submitted a response to the rejection, which included amendments and arguments in an attempt to overcome the PTO's rejections. In particular, Fischer made the following remarks about the state of the art:

> The vast majority of scan tool activity consists of monitoring timing and latency dependent data on the targeted sub-system. In every-day use, there are relatively very few discrete commands flowing from a scan tool to the vehicle bus. No discrete commands ever flow from the vehicle bus to the scan tool. What is primarily exchanged between a vehicle and a scan tool is a stream of continuous data.

Fischer's response also made the following remarks about Pruzan:

> Similarly, neither *Pruzan, Ban* nor *Chinnadurai* describe a system where continuous bi-directional communication using a standard OBD communications protocol is established between the vehicle and a remote tool.

36

> *Pruzan* describes a system for transmitting "messages" between a vehicle bus and
> a remote system. The remote system interprets the message and if it is understood
> and if there is a responding command that can be implemented, it generates the
> command and transmits it to the vehicle. *Pruzan* does not, and cannot, transmit a
> continuous stream of data to a remote location. Like *Cohen*, *Pruzan* does not
> communicate with the vehicle continuously and bi-directionally. It simply shuttles
> messages and commands back and forth between the vehicle and the remote system.
> This method of communication is only suitable for "toggling'' of functions and
> other non-timing intensive applications. The system utilized by *Pruzan* would thus
> be wholly unsuitable for the majority of the functions the remote scan tool of the
> claimed invention is designed to perform.

On July 30, 2013, the PTO issued an Office Action with a final rejection of the claims of

the '830 application over several prior art references, including Pruzan.  On January 6, 2014,

Fischer submitted a response to this rejection with no further amendments to the claims, but instead

repeating verbatim his remarks about the state of the art.  Fischer also repeated his remarks about

Pruzan, but with additional emphasis:

> *Pruzan* describes a system for transmitting "messages" between a vehicle bus and
> a remote system. The remote system interprets the message and if it is understood
> and if there is a responding command that can be implemented, it generates the
> command and transmits it to the vehicle. *Pruzan* does not, and cannot, transmit a
> continuous stream of data to a remote location. Like *Cohen*, *Pruzan* does not
> communicate with the vehicle continuously and bi-directionally. It simply shuttles
> <u>messages</u> and <u>commands</u> back and forth between the vehicle and the remote system.
> This method of communication is only suitable for "toggling'' of functions and
> other non-timing intensive applications. The system utilized by *Pruzan* would thus
> be wholly unsuitable for the majority of the functions the remote scan tool of the
> claimed invention is designed to perform.

After these remarks, the PTO adopted Fischer's position regarding Pruzan's disclosure (and other

cited prior art) and allowed the claims of the '830 application, which issued as the '313 patent.

<u>The Remarks about the State of the Art Were Misleading.</u>  For several reasons, Fischer's

remarks about the state of the art were misleading and material misrepresentations.  Scan tool

activity is dependent and will vary depending on the vehicles, scan tools, protocols, and functions

involved, and the claims are not limited to any particular vehicle, scan tools, protocols, or

functions.  Hence, Fischer's remarks are not generally applicable to all such systems, but, on information and belief, appear to be describing a specific limited embodiment even though the invention is not limited to that specific embodiment.  For example, in some embodiments, the majority of scan tool activity will not consist of monitoring timing and latency dependent data on the targeted sub-system.  Furthermore, in some embodiments, including many of the protocols identified in the Asserted Patents, scan tool activity may only occur when the scan tool issues discrete commands to the vehicle bus.  In addition, in some embodiments, it is possible for discrete commands to flow from a vehicle bus to a scan tool.  Also, a stream of continuous data is not what is primarily being exchanged between a vehicle and a scan tool at certain times or when certain protocols are being used.  Thus, Fischer's remarks were not an accurate depiction of the state of the art.  These remarks were then used to assist in distinguishing the cited prior art, which was more relevant to the claims of the '830 application than these remarks implied.

<u>The Remarks about Pruzan Were Misleading.</u>  And for several reasons, Fischer's remarks about Pruzan were misleading and material misrepresentations.  Based on Repairify's apparent interpretation of the claims, Pruzan discloses a system for scanning and programming a vehicle as if it were located proximate to it.  Specifically, Pruzan discloses the use of a local communication device that can listen to messages on the vehicle bus, send and receive messages to/from the vehicle controllers, and exchange data wirelessly with a remote diagnostic system that includes a computer and a communication device.  In Pruzan, the remote computer can monitor and/or insert messages onto the vehicle bus by using the communication devices.  Pruzan uses several SAE standard OBD protocols.  Also, while Pruzan teaches filtering of data, Pruzan also indicates that filtering of such data is optional such that its communication can be both bi-directional and continuous.  That is, Pruzan discloses transmitting a continuous stream of data from a vehicle to a

remote location.  In addition, Pruzan describes encapsulating OBD packet data from the vehicle bus to the remote system as described in the '313 patent.  Lastly, in several places, Pruzan discloses a system that is capable of more than toggling functions and other non-timing intensive applications, but instead is capable of both scanning and programming a vehicle remotely and is suitable for the majority of functions that scan tools are designed to perform.  Hence, Fischer's remarks about Pruzan in both the May 30, 2013 and January 6, 2014 responses were inaccurate because Pruzan disclosed most, if not all, of the elements claimed in the '313 patent.

Specific Intent to Deceive the PTO.  On information and belief, Fischer has a Bachelor of Science in Aerospace Engineering and Mathematics and worked as an engineer in industry before commencing his legal career.  Fischer received his *Juris Doctor* in 1994, was admitted to the Florida bar in 1995, and has been a registered patent attorney since 1999.  As an attorney admitted to practice before the PTO, Fischer had a duty of candor and good faith to the PTO.  Fischer, who was an attorney of record on the '830 application and was substantively involved in its prosecution, affirmatively made the aforementioned statements, which are misleading and misrepresentative of the state of the art and Pruzan.  In addition, Fischer repeated his statements about the state of the art and Pruzan in two separate responses to the PTO.  On information and belief, Fischer knew of the misleading and misrepresentative nature of these statements, and, hence, made the aforementioned statements with the specific intent to deceive the PTO.  But for these misleading and material misrepresentations by Fischer about the state of the art and Pruzan, the PTO would not have issued the claims of the '313 patent.  Hence, the '313 patent is unenforceable due to this inequitable conduct.

**TENTH DEFENSE**

(Unenforceability of the '500 and '334 Patents Due to Infectious Unenforceability)

The claims of the '500 and '334 patents are closely related to claims of the '313 patent and bear an immediate and necessary relationship to each other. The '500 patent is division of the '313 patent, and the '334 patent is a continuation of the '500 patent. Thus, all three patents share the same specification, and the claims are substantially similar claiming the same invention. For example, the claims of all three patents recite a local communication device connected and proximate to a vehicle in communication with a remote communication device connected to a computer/scan tool that can scan and program the vehicle as if the computer/scan tool were located proximate to the vehicle.

During the prosecution of the '500 patent, the PTO rejected the pending claims based on non-statutory double patenting over the then pending claims of U.S. Application No. 14/219,183 ("the '183 application"). In the prosecution of the '500 patent, Fischer submitted a terminal disclaimer with respect to the '183 application to overcome that rejection.

The '183 application is also a division of the '313 patent. During the prosecution of the '183 application, the claims of the '183 application that formed the basis of the double patenting rejection in the '500 patent were themselves rejected based on non-statutory double patenting over the claims of the '313 patent. In the prosecution of the '183 application, Fischer submitted two terminal disclaimers to overcome that rejection, one with respect to the '313 patent and another with respect to the '500 patent.

Similarly, during the prosecution of the '334 patent, the PTO rejected the pending claims based on non-statutory double patenting over the '500 patent. In the prosecution of the '334 patent, the patentee submitted a terminal disclaimer with respect to the '500 patent to overcome this rejection. Thus, the claims of the '313 patent and the claims of the '500 and '334 patents are closely related and bear an immediate and necessary relationship to each other.

The inequitable conduct in the '313 patent infects both the '500 and '334 patents rendering them unenforceable.  As noted in the Ninth Defense, which is incorporated by reference, the '313 patent was procured because of inequitable conduct.  The claims of the '313 patent are substantially similar to the claims of the '500 and '334 patents essentially claiming the same invention.  Hence, the claims of the '500 and '334 patents also have an immediate and necessary relationship to the inequitable conduct that occurred during the prosecution of the '313 patent.  Therefore, the inequitable conduct that occurred during the prosecution of the '313 patent also infects and renders the claims of the '500 and '334 patents unenforceable.

## ELEVENTH DEFENSE

(Unenforceability of the '500 and '334 Patents Due to Inequitable Conduct)

The claims of the '500 and '334 patents are unenforceable because of failure to disclose material references to the PTO during the prosecution of the '500 and '334 patents with the specific intent to deceive the PTO.  But for the failure to disclose these materials, the PTO would not have issued either the '500 or the '334 patents.

The Material References.  On March 19, 2014, the patentee filed the '183 application and the '500 patent, both as divisions of the '313 patent.  The application data sheet for the '183 application and '500 patent were signed by Fischer.  The '183 application shares the same specification as the Asserted Patents, and the claims of the '183 application were substantially similar to the claims of the Asserted Patents.  On May 13, 2015, the PTO issued an Office Action rejecting the claims of the '183 application as being unpatentable over several prior art references including Hunt (U.S. Pat. No. 7,778,752), Asano (U.S. Appl. No. 2007/0100513), and Naima (U.S. Appl. No. 2009/0150118) ("the First Rejection").  The PTO examiners listed on the First Rejection are Issac Smith and Tuan To.  Neither examiner was identified as involved in the prosecution of any of the Asserted Patents.  The examiners for the Asserted Patents included Shardul Patel,

Thomas G. Black, Helal A. Algahaim, Nga X. Nguyen, Khoi H. Tran, and Jelani Smith.  None of whom were not identified as being involved in the prosecution of the '183 application.

<u>Continued Involvement of Fischer in the '500 Patent and '183 Application Prosecution.</u> After the First Rejection, Fischer continued to be involved in the prosecution of the '500 patent. For example, on November 10, 2015, Fischer filed a response in the prosecution of the '500 patent that included a terminal disclaimer over the '183 application.  Also, on November 10, 2015, Fischer filed a response to the First Rejection in the prosecution of the '183 application and a terminal disclaimer over the '500 patent.

<u>Additional Material References.</u>  On March 3, 2016, the PTO issued an Office Action in the prosecution of the '183 application, which was sent to Fischer's firm, finding Fischer's arguments unpersuasive, and maintained the rejection of the claims of the '183 application as being unpatentable over several prior art references, including Hunt, Asano, and Naima ("the Second Rejection").  The patentee did not respond to the Second Rejection.  On October 6, 2016, the PTO issued a notice of abandonment for the '183 application.

<u>Involvement of King in the '183 Application and '500 Patent Prosecution.</u>  On April 25, 2016, Robert King filed powers of attorney in the '183 application and the '313 and '500 patents. On May 5, 2016, King filed a response to the PTO in the prosecution of the '500 patent.  On July 14, 2016, King participated in an interview with the PTO regarding the '500 patent.  On September 22, 2016, King filed a response to the PTO during the prosecution of the '500 patent.  On December 9, 2016, King filed another response to the PTO during the prosecution of the '500 patent.  On February 23, 2017, the PTO issued a Notice of Allowance for the '500 patent.  On March 28, 2017, King filed an information disclosure statement with the PTO during the prosecution of the '500 patent.  On June 20, 2017, the PTO issued the '500 patent.  King did not disclose in the prosecution

of the '500 patent the First Rejection, the Second Rejection, Hunt, Asano, Naima, or that the '183 application had been abandoned.

Involvement of King in the '334 Patent Prosecution.  On June 12, 2017, King filed the '334 patent as a continuation of the '500 patent and also submitted an information disclosure sheet.  On January 7, 2020, the PTO issued the '334 patent.

Failure to Disclose Material References by Fischer and King.  At no time during the prosecution of the '500 patent did Fischer disclose to the examiners of the '500 patent the First Rejection, Second Rejection, Hunt, Asano, or Naima.  And at no time during the prosecution of the '500 or '334 patents did King disclose to the examiners of the '500 and '334 patents the First Rejection, Second Rejection, Hunt, Asano, Naima, or that the '183 application had been abandoned.  There is no record of the examiners of the '500 and '334 patents of considering or being provided with the First Rejection, the Second Rejection, Hunt, Asano, Naima, or other relevant material for the '183 application such as its notice of abandonment.  That is, during the prosecution of the '500 and '334 patents, these materials were not disclosed to the PTO.

The Similarity of Claims.  The claims of the '183 application are substantially similar to the claims of the '500 and '334 patents claiming the same invention.  For example, the claims of all three recite a local communication device connected and proximate to a vehicle in communication with a remote communication device connected to a computer/scan tool that can scan and program the vehicle as if the computer/scan tool were located proximate to the vehicle. During the prosecution of the '500 patent, the PTO rejected the pending claims based on non-statutory double patenting over the then pending claims of the '183 application.  Similarly, during prosecution of the '183 application, Fischer submitted a terminal disclaimer over the '500 patent. Also, during the prosecution of the '334 patent, the PTO rejected the pending claims based on non-

statutory double patenting over the '500 patent.  The patentee submitted a terminal disclaimer to overcome this rejection.  Thus, the claims of the '183 application and the claims of the '500 and '334 patents are substantially similar to each other claiming the same invention.

The Omitted Prior Art and '183 Application Documents are But-For Material.  Hunt discloses a system for connecting a telematics device to a vehicle using a wireless receiver configured to transmit diagnostic data.  Asano discloses information updating method of vehicle-mounted control apparatus, update information communication system, vehicle-mounted control apparatus, and information management base station apparatus.  Specifically, Asano discloses a transceiver connected to the vehicle's data bus that has bi-directional wireless communication with a remote transceiver connected to a remote server that allows the remote server to update the programs on the vehicle's sub-systems.  Naima discloses a method and apparatus for secure wireless tracking and control.  Specifically, Naima discloses a mobile computer connected to a vehicle's sub-systems that communicates bi-directionally and wirelessly over a network to a transceiver connected to a remote base computer.  The base computer can track, monitor, and/or control the vehicle by exchanging data with the mobile computer.

In the First Rejection, the PTO stated that Asano, Hunt, and Naima taught each of the claimed elements.  For example, the First Rejection stated that Asano taught a system for remotely programming one or more sub-systems of a vehicle comprising a vehicle communication device and a remote communication device and to the extent Asano did not explicitly disclose other limitations, those limitations were "merely a collection of well-known components and steps which would have been obvious for a person having ordinary skill in the art at the time of the invention to include, as they were conventional and commonly used in vehicle diagnostics-related systems at the time of the invention, as seen in the prior art."   Furthermore, with respect to the

limitations of a "vehicle communication device and said remote communication device enabled, to engage in continuous bi-directional communication using a standard OBD communications protocol, via a bi-directional communication link" and "wherein said remote communication device is enabled by said continuous bi-directional communication using a standard OBD communications protocols to actively and continuously communicate with, scan and program said sub-systems as if it were located proximate to said vehicle," the First Rejection stated that these "limitations were well-known and conventional in communication systems related to vehicle diagnostics, as seen in **Naima**."

Fischer tried to overcome the First Rejection by using arguments identical to arguments made during the prosecution of the '313 patent.  In the '183 application prosecution, however, the PTO in the Second Rejection rejected those arguments and maintained its rejection of the claims of the '183 application based on Hunt, Asano, and Naima.  For example, in addition to repeating its positions from the First Rejection, the Second Rejection added, in part, that:

- "the system of *Asano* is clearly suited for any bi-directional communication;"

- "it is clear that this detection and transmission of diagnostic information of Naima is **continuously** performed;" and

- "the claimed '**continuous bi-directional communication**' . . . is rendered obvious by the prior art."

Instead of substantively responding to the Second Rejection, the patentee let the '183 application become abandoned.  Thus, during the '183 application, the PTO rejected nearly identical claims to the '500 and '334 patents based on Hunt, Asano, and Naima.

In the Notice of Allowability for both the '500 and '334 patents, the examiner indicated that the closest prior art did not teach or make obvious the last limitation of to enable the vehicle scan tool to scan and program a vehicle sub-system of the subject vehicle as if it the vehicle scan tool were located proximate to the subject vehicle.  This statement is contrary to what the PTO

determined during the prosecution of the '183 application.  If the PTO examiners of the '500 and '334 patents were aware of Hunt, Asano, and Naima, as well as the First and Second Rejections and related materials, the PTO would not have allowed the claims of the '500 and '334 patents to issue.

Specific intent to deceive the PTO.  On information and belief, Fischer has a Bachelor of Science in Aerospace Engineering and Mathematics and worked as an engineer in industry before commencing his legal career.  On information and belief, Fischer received his *Juris Doctor* in 1994, was admitted to the Florida bar in 1995, and has been a registered patent attorney since 1999. As an attorney admitted to practice before the PTO, Fischer had a duty of candor and good faith to the PTO.  On information and belief, King has a Bachelor of Science in Electrical Engineering, received his *Juris Doctor* in 1999, and has been a registered patent attorney since 1999.  As an attorney admitted to practice before the PTO, King has a duty of candor and good faith to the PTO.

In other circumstances, the patentee and its attorneys, including King and other attorneys at his law firm, had a practice of submitting references from other related prosecutions to the PTO. For example, during the prosecution of the '500 patent, after the PTO issued a notice of allowance, on March 28, 2017, King submitted an IDS identifying references that were cited in a communication from a foreign patent office in a counterpart application to the Asserted Patents and included the communications from that foreign patent office.  And, when the PTO declined to consider that IDS for failure to submit the required fee, King, on May 8, 2017, resubmitted the same IDS again (with the required fee) to ensure the references were considered by the PTO.

Similarly, during the prosecution of the '334 patent, after the PTO issued a notice of allowance, on September 23, 2019, another attorney at King's law firm filed a Request for Continued Examination ("RCE") and an IDS identifying references that were cited in a

communication from a foreign patent office in a counterpart application to the Asserted Patents and included the communications from that foreign patent office.  Then on October 16, 2019, that same attorney submitted a second IDS with references that were cited in a communication from a different foreign patent office in a different counterpart application to the Asserted Patents and included the communications from that foreign patent office.

In other circumstances, the patentee had a practice of continuing to prosecute a patent despite a final rejection until the PTO allowed the application.  On information and belief, Fischer and/or King was involved in the decision to not respond to the Second Rejection, which was a final rejection, and let the '183 application become abandoned.  That decision is in contrast to how the patentee prosecuted the Asserted Patents.  For example, during the prosecution of the '313 patent, Fischer responded to a final rejection and filed a RCE before the PTO allowed the claims.  Likewise, during the prosecution of the '500 patent, King responded to a final rejection by filing a Pre-Brief Conference request with arguments in order to overcome the final rejection.

Furthermore, on April 20, 2016, less than two months after the Second Rejection, King filed a RCE in the '500 patent prosecution cancelling the pending claims, which were similar to the pending claims of the '183 application that focused on the communication devices each having a socket and enabled by continuous bi-directional communication, and added new claims that eventually issued as the '500 patent that did not recite certain elements found in the '183 application claims such as communication devices with sockets that were enabled by continuous bi-directional communication.

Fischer and King were both attorneys of record during the '183 application and both were involved in the prosecution of the '183 application and '500 patent.  King was also involved in the prosecution of the '334 patent.  On information and belief, both Fischer and King were aware of

Hunt, Asano, and Naima and the First and Second Rejections.  On information and belief, Fischer failed to disclose Hunt, Asano, Naima, the First Rejection, and Second Rejection to the examiners of the '500 patent during its prosecution with specific intent to deceive the PTO.  On information and belief, King failed to disclose Hunt, Asano, Naima, the First Rejection, Second Rejection, and other relevant materials related to the prosecution of the '183 application to the examiners of the '500 and '334 patents during their prosecution with specific intent to deceive the PTO.

But for these of material omissions by Fischer and King, the PTO would not have issued the claims of the '500 and '334 patents.  Hence, the '500 and '334 patents are unenforceable due to this inequitable conduct.

### TWELTH DEFENSE

(Unenforceability of the '313 Patent Due to Infectious Unenforceability)

The claims of the '313 patent are closely related to claims of the '500 and '334 patents and bear an immediate and necessary relationship to each other.  The '500 patent is division of the '313 patent, and the '334 patent is a continuation of the '500 patent.  Thus, all three patents share the same specification, and the claims are substantially similar claiming the same invention.  For example, the claims of all three patents recite a local communication device connected and proximate to a vehicle in communication with a remote communication device connected to a computer/scan tool that can scan and program the vehicle as if the computer/scan tool were located proximate to the vehicle.

During the prosecution of the '500 patent, the PTO rejected the pending claims based on non-statutory double patenting over the then pending claims of U.S. Application No. 14/219,183 ("the '183 application").  In the prosecution of the '500 patent, Fischer submitted a terminal disclaimer with respect to the '183 application to overcome that rejection.

The '183 application is a division of the '313 patent.  During prosecution of the '183 application, the claims of the '183 application that formed the basis of the double patenting rejection in the '500 patent were themselves rejected based on non-statutory double patenting over the claims of the '313 patent.  In the prosecution of the '183 application, Fischer submitted two terminal disclaimers in the '183 application to overcome that rejection, one with respect to the '313 patent and another with respect to the '500 patent.

Similarly, during the prosecution of the '334 patent, the PTO rejected the pending claims based on non-statutory double patenting over the '500 patent.  In the prosecution of the '334 patent, the patentee submitted a terminal disclaimer with respect to the '500 patent to overcome this rejection.  Thus, the claims of the '313 patent and the claims of the '500 and '334 patents are closely related and bear an immediate and necessary relationship to each other.

The inequitable conduct in the '500 and '334 patents infect the '313 patent rendering it unenforceable.  As noted in the Eleventh Defense, which is incorporated by reference, the '500 and '334 patents were procured because of inequitable conduct.  The claims of the '313 patent are similar to the claims of the '500 and '334 patents.  Hence, the claims of the '313 patent also have an immediate and necessary relationship to the inequitable conduct that occurred during the prosecution of the '500 and '334 patents.  Therefore, the inequitable conduct that occurred during the prosecution of the '500 and '334 patents also infects and renders the claims of the '313 patent unenforceable.

**RESERVATION OF DEFENSES**

Elitek reserves all affirmative defenses under Rule 8I of the Federal Rules of Civil Procedure, the Patent Laws of the United States, and any other defenses, at law or in equity, that may now exist or in the future be available based on discovery and further factual investigation in

49

this case.  Elitek further reserves the right to amend or supplement its defenses without prejudice as additional facts are discovered.

## ELITEK'S COUNTERCLAIMS

Defendant and Counterclaim Plaintiff Keystone Automotive Industries, Inc. d/b/a Elitek Vehicle Services ("Elitek"), by and through its undersigned counsel, hereby asserts the following counterclaims against Plaintiff and Counterclaim Defendant Repairify, Inc. ("Repairify") as follows:

## PARTIES

1.      Elitek is a corporation organized under the laws of the State of California with a place of business at 1910 Crown Road, Farmers Branch, TX 75234.

2.      On information and belief, Repairify is a corporation organized under the laws of the State of Delaware, with a principal place of business located at 2600 Technology Drive, Suite 900, Plano, TX 75074.

## JURISDICTION AND VENUE

3.      These counterclaims arise under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.,* and the Patent Act, 35 U.S.C. § 101, *et seq.*  This Court has subject matter jurisdiction over these counterclaims under 28 U.S.C. §§ 1331, 1338(a), 1367, 2201 and 2202.

4.      This Court has personal jurisdiction over Repairify because, inter alia, Repairify has submitted to the jurisdiction of this Court by purposefully availing itself of the benefits and protections of the laws of this judicial district through filing this action in this District.

5.      Venue for these counterclaims is proper in this judicial district because Repairify has consented to this venue by commencing and prosecuting this patent infringement action against Elitek in this District.

## COUNTERCLAIM COUNT I

(Declaratory Judgment of Non-Infringement of the '313 Patent)

6.      Elitek realleges and incorporates by reference the allegations in Paragraphs 1-5 of its Counterclaims and all Defenses above as though fully set forth herein.

7.      Repairify has filed an infringement action in this Court to enforce the '313 patent against Elitek.  Elitek has denied that it has infringed or is presently infringing any valid and enforceable claim of the '313 patent.  *See, e.g.,* Elitek's Motion to Dismiss filings (Dkt. Nos. 23, 24, 28, 29), which are hereby incorporated by reference.  Therefore, an actual and justiciable controversy exists between Repairify and Elitek.

8.      Elitek does not and has not infringed, either literally or under the doctrine of equivalents, directly or indirectly, any valid and enforceable claim of the '313 patent.

9.      Elitek is entitled to a declaratory judgment that it does not and has not infringed, either literally or under the doctrine of equivalents, directly or indirectly, any valid and enforceable claim of the '313 patent.  Absent a declaration and order as sought by Elitek, Repairify will continue to wrongfully assert that Elitek has infringed Repairify's patent rights, including any rights in, or to, any valid and enforceable claim of the '313 patent, thereby causing Elitek irreparable injury and damage.

## COUNTERCLAIM COUNT II

(Declaratory Judgment of Non-Infringement of the '500 Patent)

10.     Elitek realleges and incorporates by reference the allegations in Paragraphs 1-9 of its Counterclaims and all Defenses above as though fully set forth herein.

11.     Repairify has filed an infringement action in this Court to enforce the '500 patent against Elitek.  Elitek has denied that it has infringed or is presently infringing any valid and enforceable claim of the '500 patent.  *See, e.g.,* Elitek's Motion to Dismiss filings (Dkt. Nos. 23,

24, 28, 29), which are hereby incorporated by reference.  Therefore, an actual and justiciable controversy exists between Repairify and Elitek.

12.     Elitek does not and has not infringed, either literally or under the doctrine of equivalents, directly or indirectly, any valid and enforceable claim of the '500 patent.

13.     Elitek is entitled to a declaratory judgment that it does not and has not infringed, either literally or under the doctrine of equivalents, directly or indirectly, any valid and enforceable claim of the '500 patent.  Absent a declaration and order as sought by Elitek, Repairify will continue to wrongfully assert that Elitek has infringed Repairify's patent rights, including any rights in, or to, any valid and enforceable claim of the '500 patent, thereby causing Elitek irreparable injury and damage.

## COUNTERCLAIM COUNT III

(Declaratory Judgment of Non-Infringement of the '334 Patent)

14.     Elitek realleges and incorporates by reference the allegations in Paragraphs 1-13 of its Counterclaims and all Defenses above as though fully set forth herein.

15.     Repairify has filed an infringement action in this Court to enforce the '334 patent against Elitek.  Elitek has denied that it has infringed or is presently infringing any valid and enforceable claim of the '334 patent.  *See, e.g.,* Elitek's Motion to Dismiss filings (Dkt. Nos. 23, 24, 28, 29), which are hereby incorporated by reference.  Therefore, an actual and justiciable controversy exists between Repairify and Elitek.

16.     Elitek does not and has not infringed, either literally or under the doctrine of equivalents, directly or indirectly, any valid and enforceable claim of the '334 patent.

17.     Elitek is entitled to a declaratory judgment that it does not and has not infringed, either literally or under the doctrine of equivalents, directly or indirectly, any valid and enforceable claim of the '334 patent.  Absent a declaration and order as sought by Elitek, Repairify will

continue to wrongfully assert that Elitek has infringed Repairify's patent rights, including any rights in, or to, any valid and enforceable claim of the '334 patent, thereby causing Elitek irreparable injury and damage.

## COUNTERCLAIM COUNT IV

### (Declaratory Judgment of Invalidity of the '313 Patent)

18. Elitek realleges and incorporates by reference the allegations in Paragraphs 1-17 of its Counterclaims and all Defenses above as though fully set forth herein.

19. Repairify has filed an infringement action in this Court to enforce the '313 patent against Elitek.  Elitek has denied that it has infringed or is presently infringing any valid and enforceable claim of the '313 patent.  Therefore, an actual and justiciable controversy exists between Repairify and Elitek.

20. The asserted claims of the '313 patent are invalid for failure to meet the requirements of the U.S. patent laws, 35 U.S.C. §§ 101, *et. seq.*, including but not limited to 35 U.S.C. §§ 101, 102, 103, and 112.  On February 14, 2022, Elitek served upon Repairify its Preliminary Invalidity Contentions, inter alia, showing why the asserted claims of the '313 patent are invalid.  Those preliminary invalidity contentions, as well as any additional invalidity contentions served by Elitek in this action, are hereby incorporated by reference.

21. Elitek is entitled to a declaratory judgment that the asserted claims of the '313 patent are invalid.

## COUNTERCLAIM COUNT V

### (Declaratory Judgment of Invalidity of the '500 Patent)

22. Elitek realleges and incorporates by reference the allegations in Paragraphs 1-21 of its Counterclaims and all Defenses above as though fully set forth herein.

23.     Repairify has filed an infringement action in this Court to enforce the '500 patent against Elitek.  Elitek has denied that it has infringed or is presently infringing any valid and enforceable claim of the '500 patent.  Therefore, an actual and justiciable controversy exists between Repairify and Elitek.

24.     The asserted claims of the '500 patent are invalid for failure to meet the requirements of the U.S. patent laws, 35 U.S.C. §§ 101, *et. seq.*, including but not limited to 35 U.S.C. §§ 101, 102, 103, and 112.  On February 14, 2022, Elitek served upon Repairify its Preliminary Invalidity Contentions, inter alia, showing why the asserted claims of the '500 patent are invalid.  Those preliminary invalidity contentions, as well as any additional invalidity contentions served by Elitek in this action, are hereby incorporated by reference.

25.     Elitek is entitled to a declaratory judgment that the asserted claims of the '500 patent are invalid.

## COUNTERCLAIM COUNT VI

(Declaratory Judgment of Invalidity of the '334 Patent)

26.     Elitek realleges and incorporates by reference the allegations in Paragraphs 1-25 of its Counterclaims and all Defenses above as though fully set forth herein.

27.     Repairify has filed an infringement action in this Court to enforce the '334 patent against Elitek.  Elitek has denied that it has infringed or is presently infringing any valid and enforceable claim of the '334 patent.  Therefore, an actual and justiciable controversy exists between Repairify and Elitek.

28.     The asserted claims of the '334 patent are invalid for failure to meet the requirements of the U.S. patent laws, 35 U.S.C. §§ 101, *et. seq.*, including but not limited to 35 U.S.C. §§ 101, 102, 103, and 112.  On February 14, 2022, Elitek served upon Repairify its Preliminary Invalidity Contentions, inter alia, showing why the asserted claims of the '334 patent

are invalid.   Those preliminary invalidity contentions, as well as any additional invalidity contentions served by Elitek in this action, are hereby incorporated by reference.

29.     Elitek is entitled to a declaratory judgment that the asserted claims of the '334 patent are invalid.

## COUNTERCLAIM COUNT VII

(Declaratory Judgement of Unenforceability of the '313 Patent)

30.     Elitek realleges and incorporates by reference the allegations in Paragraphs 1-29 of its Counterclaims and all Defenses above as though fully set forth herein.

31.     Repairify has filed an infringement action in this Court to enforce the '313 patent against Elitek.   Elitek has denied that it has infringed or is presently infringing any valid and enforceable claim of the '313 patent.   Therefore, an actual and justiciable controversy exists between Repairify and Elitek.

32.     The claims of the '313 patent are unenforceable due to inequitable conduct committed during the prosecution of the '313 patent, as detailed in Elitek's Ninth Defense above. Separately, the claims of the '313 patent are also unenforceable due to inequitable conduct committed during the prosecution of the '500 and '334 patents, as detailed in Elitek's Twelfth Defense above, which infects and renders the claims of the '313 unenforceable.   Elitek restates and realleges the allegations set forth in its Ninth and Twelfth Defenses above and incorporates them by reference.

33.     Elitek is entitled to a declaratory judgment that the claims of the '313 patent are unenforceable due to inequitable conduct.

## COUNTERCLAIM COUNT VIII

### (Declaratory Judgement of Unenforceability of the '500 Patent)

34.     Elitek realleges and incorporates by reference the allegations in Paragraphs 1-33 of its Counterclaims and all Defenses above as though fully set forth herein.

35.     Repairify has filed an infringement action in this Court to enforce the '500 patent against Elitek.  Elitek has denied that it has infringed or is presently infringing any valid and enforceable claim of the '500 patent.  Therefore, an actual and justiciable controversy exists between Repairify and Elitek.

36.     The claims of the '500 patent are unenforceable due to inequitable conduct committed during the prosecution of the '500 patent, as detailed in Elitek's Eleventh Defense above.  Separately, the claims of the '500 patent are also unenforceable due to inequitable conduct committed during the prosecution of the '313 patent, as detailed in Elitek's Tenth Defense above, which infects and renders the claims of the '500 unenforceable.  Elitek restates and realleges the allegations set forth in its Tenth and Eleventh Defenses above and incorporates them by reference.

37.     Elitek is entitled to a declaratory judgment that the claims of the '500 patent are unenforceable due to inequitable conduct.

## COUNTERCLAIM COUNT IX

### (Declaratory Judgement of Unenforceability of the '334 Patent)

38.     Elitek realleges and incorporates by reference the allegations in Paragraphs 1-37 of its Counterclaims and all Defenses above as though fully set forth herein.

39.     Repairify has filed an infringement action in this Court to enforce the '334 patent against Elitek.  Elitek has denied that it has infringed or is presently infringing any valid and enforceable claim of the '334 patent.  Therefore, an actual and justiciable controversy exists between Repairify and Elitek.

40.     The claims of the '334 patent are unenforceable due to inequitable conduct committed during the prosecution of the '334 patent, as detailed in Elitek's Eleventh Defense above.  Separately, the claims of the '334 patent are also unenforceable due to inequitable conduct committed during the prosecution of the '313 patent, as detailed in Elitek's Tenth Defense above, which infects and renders the claims of the '334 unenforceable.  Elitek restates and realleges the allegations set forth in its Tenth and Eleventh Defenses above and incorporates them by reference.

41.     Elitek is entitled to a declaratory judgment that the claims of the '334 patent are unenforceable due to inequitable conduct.

## PRAYER FOR RELIEF

WHEREFORE, Elitek prays that the Court enter judgment:

A.     in favor of Elitek and against Repairify;

B.     dismissing Repairify's Complaint for Patent Infringement with prejudice and granting Repairify no relief against Elitek;

C.     declaring that Elitek has not infringed and does not infringe any valid and enforceable claim of the '313, '500, and '334 patents;

D.     declaring that the claims of the '313, '500, and '334 patents are invalid;

E.     declaring that the claims of the '313, '500, and' 334 patents are unenforceable due to inequitable conduct;

F.     declaring that this case is exceptional under 35 U.S.C. § 285 and awarding Elitek its attorney's fees and expenses in this action;

G.     awarding Elitek its costs in this action; and

H.     granting such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Elitek demands a trial by jury on all issues triable by jury.

Dated:  July 20, 2022                           Respectfully submitted,

/s/ Barry F. Irwin _
Barry F. Irwin, P.C. (admitted *pro hac vice*)
Joseph Saltiel (admitted *pro hac vice*)
Daniel Sokoloff (admitted *pro hac vice*)
**IRWIN IP LLC**
150 N. Wacker Dr., Suite 700
Chicago, Illinois 60606
birwin@irwinip.com
jsaltiel@irwinip.com
dsokoloff@irwinip.com
(312) 667-6080 (Telephone)

Barry K. Shelton
Texas State Bar No. 24055029
**WINSTON & STRAWN LLP**
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
bshelton@winston.com
(214) 453-6407 (Telephone)

*Attorneys for Defendant Keystone Automotive*
*Industries, Inc. d/b/a Elitek Vehicle Services*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing

document has been served on all counsel of record via the Court's ECF system.

*/s/ Barry F. Irwin*

Barry F. Irwin
