# Exhibit N

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Repairify, Inc., d/b/a asTech, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | CIVIL ACTION NO. 19-CV-1370 |
| v. | § | |
| | § | |
| AirPro Diagnostics LLC, | § | |
| | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFF REPAIRIFY, INC.'S ORIGINAL COMPLAINT

Plaintiff Repairify, Inc., d/b/a asTech ("asTech") files this Complaint against defendant AirPro Diagnostics LLC ("AirPro").

## I.    NATURE OF THE ACTION

1.      Plaintiff asTech offers remote scanning of automobile computer modules to auto repair shops and service centers nationwide.    asTech employs a unique technology and methodology that offers substantial advantages over competing aftermarket products.    After investing millions of dollars in testing and development, in mid-2016, asTech launched a redesigned and recreated version of its remote diagnostic device (hereinafter the "asTech Device"), that offers superior reliability and results.  asTech prides itself on conveying complete, honest, and accurate information to customers in its sales and marketing of the improved asTech Device.  As a result of both its improved asTech Device and its focus on honest and fair communication with customers, asTech has rapidly become a market leader in the automotive repair industry.

2.      AirPro is a competing company that was formed by two former asTech employees after they drove asTech's predecessor into bankruptcy.  Rather than compete fairly in the marketplace on the merits, AirPro has sought to undermine asTech's business relationships and

1

KAI007954

credibility in the industry by disseminating false and misleading comparative advertisements about asTech's products and services. AirPro has disseminated its false and misleading representations both on its website and through a targeted misinformation campaign of communications directly to customers and original equipment manufacturers ("OEMs").

3. AirPro devotes an entire section of its website to a series of false and misleading representations about asTech's products, asTech's business practices, and comparisons between AirPro and asTech. In addition to unfairly maligning asTech, AirPro has also fundamentally misrepresented its own capabilities to asTech's customers, potential customers, OEMs, and other industry members.

4. asTech has asked AirPro to stop making false representations in its advertising, so that the two companies can compete fairly on the merits. However, AirPro has only escalated its misinformation campaign in response. Not content with merely publishing false information on its website, AirPro has now sent a letter directly to asTech's customers, OEMs, media outlets, and other industry participants attaching the false and misleading statements from its website and further unfairly maligning asTech's products and integrity.

5. AirPro's willful and unfair competitive practices have irreparably damaged asTech's business and caused unquantifiable damages. asTech had no choice but to file this civil action and seek preliminary and permanent injunctive relief to address AirPro's false advertising in violation of the Lanham Act, 15 U.S.C. § 1051 *et seq.*; business disparagement; intentional interference with asTech's prospective business relationships; and defamation.

## II. THE PARTIES

6. asTech is a Delaware corporation with its principal place of business in Plano, Texas. asTech has a branch office in Houston, Texas and mobile and in-shop employees in Houston, Texas.

2

KAI007955

7.     AirPro is a Florida limited liability company with its principal place of business in Jacksonville, Florida.  Upon information and belief, AirPro's members are Lonnie E. Margol, Scotty West, and Stephen Casella, each of whom is a natural person and a citizen of Florida.

### III.     VENUE AND JURISDICTION

8.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because asTech asserts claims for false advertising under the Lanham Act, 15 U.S.C. § 1125.

9.     This Court has supplemental jurisdiction over asTech's state law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to the claims in this action over which this Court has original jurisdiction that they form part of the same case or controversy.

10.     Additionally, the Court also has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interests and costs, and is between citizens of different states.

11.     This Court has personal jurisdiction over AirPro because AirPro conducts business in Texas (in fact AirPro's Senior Vice President of Sales Frank LaViola resides in Houston, Texas and conducts business there), has committed tortious acts in Texas, and has intentionally directed its conduct against asTech in Texas, where the primary effects of that conduct were felt.

12.     Venue is appropriate in this judicial district under 28 U.S.C. § 1391 because AirPro conducts business in this district, has an employee in this district, and falsely advertised nationally and within this district.  AirPro is thus subject to personal jurisdiction in this district and therefore "resides" in this district as set forth in 28 U.S.C. § 1391(c)-(d) and § 1391(b)(1).

KAI007956

## IV.    ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

**A.    The asTech Device and the Remote Scanning Market**

13.    asTech has enjoyed enormous success since relocating to Plano, Texas in July, 2015, and has become a market leader in the automotive repair industry through sales of its innovative and reliable remote scanning devices.

14.    asTech's current success represents a dramatic reversal of fortune compared to its predecessor entity, the Collision Diagnostic Services ("CDS") business of AES Technologies, LLC ("AES"). CDS had been in the business of remote scanning of computer modules in automobiles and other vehicles. CDS marketed and sold a product called "asTech" that performed remote scanning of automobile computer modules (the "First Gen asTech Device").

15.    The previous owners of CDS developed the First Gen asTech Device in conjunction with Paragon Innovation, an engineering firm located in Richardson, Texas, and had the product manufactured by a third party, ACD, also located in Richardson, Texas. Despite known issues and short-comings with the First Gen asTech Device, the previous owners went to market claiming OEM equivalency.

16.    The CDS business was ultimately not successful. By 2015 the CDS business found itself in bankruptcy due to the failure of its previous management team.

17.    On July 21, 2015, asTech stepped in and bought the operating assets of CDS out of bankruptcy. Among other assets, asTech purchased all of the rights to the First Gen asTech Device.

18.    During the due diligence process, the new owners' initial research confirmed major deficiencies with the First Gen asTech Device, which included significant lack of coverage, missing communication on the vehicle's on-board diagnostic system ("OBD II") port, inability to communicate with the medium speed BUS and most importantly the inability to deal effectively

4

KAI007957

with internet latency issues. The new owners also could not find any proof that the previous owners had validated their claims about the effectiveness of the First Gen asTech Device. As a result of these issues, the new owners made the decision to immediately stop selling the First Gen asTech Device.

19. asTech's new owners spent the next 12 months and invested millions of dollars in research and development to address these deficiencies and create a better product. asTech did extensive regression testing and field work on a next generation device, including by leveraging its relationship with Copart, Inc., the industry's leading auto salvage auction company, which is headquartered in Dallas, Texas, to access hundreds of wrecked vehicles, in order to test that the product worked as promised. Ultimately, asTech completely recreated its product. The current asTech Device is not an enhanced version of the First Gen asTech device, but rather a completely new product, built from the ground up. In fact, the current asTech Device is manufactured by SVTronics, located in Plano, Texas, as the First Gen asTech device manufacturer went out of business.

20. asTech introduced its new product to the market in July of 2016. This second-generation device performs all of the same functions as the First Gen asTech Device (and more), and addresses the deficiencies associated with the earlier device's performance.

21. asTech originally marketed the new device as the "asTech2" to differentiate it from the faulty First Gen asTech Device and convey to customers that this was a new product. However, with an improved product, asTech's customer base grew rapidly, and many of the new customers had no experience with the First Gen asTech Device. As a result, the "asTech2" device soon became simply the "asTech" in the minds of consumers, and asTech now markets it exclusively as

5

KAI007958

the "asTech" (the "asTech Device").  asTech stopped selling the First Gen asTech Device in July 2015, and stopped servicing the First Gen asTech Device in December 2016.

22.     The asTech Device, now asTech's primary product, is a patented remote diagnostic device that allows collision shops and repair technicians to have a vehicle scanned before or after repair work is done.  Scanning ensures that all of the vehicle's issues are fully addressed and that all systems are working properly.  Although the asTech Device can connect to virtually any scan tool, the company has chosen to purchase and use OEM factory scan tools, based on their superior performance over aftermarket tools.

23.     The asTech Device allows asTech to remotely scan, diagnose, and/or program computer modules in automobiles that are located at body shops or other remote locations.  Modern automobiles can have up to 50 computer modules, which can control up to 80 percent of an automobile's mechanical and electrical functions, such as braking, steering control, traction control, collision avoidance, and fuel oxygen systems.  When an automobile develops a fault associated with one of these functions, the associated computer module generates what is known as a "trouble code."  To properly diagnose and repair the fault, a mechanic must be able to electronically scan the car's computer modules to determine the trouble codes.

24.     Generally speaking, scan tools fall into two categories: OEM factory scan tools and aftermarket scan tools.  OEM factory scan tools are produced by each individual automaker and are specifically designed to work with each individual automaker's own vehicles.  Most OEM tools either provide access to the vehicle build data in their tool or access the vehicle build data during the scanning process, ensuring all systems on the vehicle being scanned are present and functioning as designed.  An automaker's OEM scan tool provides complete and up-to-date software that can scan and program all of the computer modules in vehicles made by that OEM

6

KAI007959

because they know what systems should be on a vehicle. This is especially important following an automobile accident, since the vehicle may arrive at the repair shop with parts missing or have hidden undetected damage, which can only be determined using the OEM tool.

25.     Aftermarket scan tools, unlike OEM factory scan tools, are made by companies not affiliated with OEMs. These scan tools provide basic scanning and programming capabilities for many cars, but lack the comprehensive capabilities of OEM factory scan tools. A large reason for this is the OEMs do not provide the aftermarket scan tool suppliers with access to the vehicle's build data. Indeed, even the highest end aftermarket scan tools will not provide coverage for all computer modules for most cars and will be one to two model years out of date.

26.     Some OEMs do not even allow aftermarket scan tools to interface with their vehicles. For example, 2019 Chrysler vehicles will not respond at all to certain aftermarket scan tools due to added encryption on the OBD II port.

27.     In other cases, an aftermarket scan tool may connect to a vehicle, but may report scan results inaccurately due to OEM updates that are not recognized by aftermarket scanners. For example, if a 2018 vehicle has twelve computer modules, two of which are not functioning, an OEM scan tool would inform a user that ten of twelve modules are working correctly. However, an aftermarket scan tool may only recognize the ten working modules and have no way of notifying a user that the two non-working modules even exist.

28.     Given the complexities of operating each individual OEM factory scan tool and the high stakes of electronic automobile repairs, asTech is careful to maintain an open dialogue with its customers about the limitations of scanning damaged vehicles remotely, including the makes and models of cars that asTech can reliably scan.

7

KAI007960

29.     Thus, asTech differentiates itself in the market because its patented asTech Device and services perform comprehensive, up-to-date remote scanning and programming through the use of OEM factory scan tools.   asTech stands behind its asTech Devices and will provide replacement Devices at users' requests without charge, except if the failure is obviously due to misuse or if the customer is not in good standing.

**B.     The Formation of AirPro**

30.     On information and belief, from 2013 to 2015, Lonnie E.  Margol was the chief executive officer of AES, overseeing the CDS business (including the First Gen asTech Device). During this time period, AES went bankrupt, and Mr. Margol's employment was terminated prior to asTech's acquisition of the AES assets.   Mr. Margol had no role in the development, implementation, or sale of the current asTech Device.  Therefore, Mr. Margol was only familiar with the bug-riddled First Gen asTech Device (which has not been sold since July 2015), and is completely unfamiliar with the current asTech Device.

31.     On or about April 11, 2016, Mr. Margol founded AirPro.  AirPro competes directly with asTech in Texas and throughout the United States, and offers a competing product called the AirPro (the "AirPro Device"), as well as competing remote automobile scanning services.

32.     In November 2015, Mr. Margol recruited Chuck Olsen to join him at AirPro.  Mr. Olsen had worked for AES and stayed with AES after it filed for bankruptcy.  Mr. Olsen was employed at asTech from July 21 to November 17, 2015, and was intimately familiar with the First Gen asTech Device.  As a result of their experience with First Gen asTech Device, both Mr. Margol and Mr. Olsen are well-aware of the differences between OEM factory scan tools and aftermarket scan tools, and the limitations of aftermarket scanners compared to those provided by auto manufacturers.

8

KAI007961

33.     On information and belief, the AirPro Device is comprised of two aftermarket tools: one called Drew Tech and one called Autoenginuity.  The AirPro Device combines the aftermarket scanning capability of the Autoenginuity with the programming ability of the Drew Tech.  Neither Autoenginuity nor Drew Tech fully duplicates the capabilities and coverage of OEM scan tools.

34.     Therefore, the AirPro Device is limited in the makes of vehicles that it can correctly scan, and in the modules within each vehicle that it can recognize.  These limitations mean that the accuracy of the AirPro Device is significantly lower than the accuracy of OEM factory tool scans.

**C.     AirPro's False and Misleading Advertising Campaign**

35.     Dating back to its founding, AirPro has targeted asTech through various misleading advertisements and acts of unfair competition.   Most egregiously, AirPro has consistently misrepresented its access to and use of OEM software and scan tools.  These tactics forced asTech to file suit against AirPro once before, in 2016.  Eventually a settlement was reached in that lawsuit, and asTech continued to grow its business and succeed in the marketplace.

36.     However, in recent months, AirPro has once again aggressively targeted asTech and adopted predatory tactics in its advertising and marketing.

37.     For example, in late 2018, AirPro used the ASTECH trademark as part of a paid Google search result.   Consequently, when a consumer searched for "asTech", a paid advertisement appeared with the headline "Astech | The Hybrid All In One Tool | airprodiagnostics.com", causing the paid search result to appear to be the asTech website, when the result instead went to the AirPro website.  AirPro thus hoped to deceive asTech customers or potential customers into going to the AirPro website when they were searching for asTech.  After

9

KAI007962

receiving notice of the deceptive advertisement from asTech, Google removed AirPro's paid advertisement that used the ASTECH trademark.

38.     AirPro further escalated its activities in 2019.  In or about January 2019, AirPro, in an effort to lure away asTech's customers and damage asTech's relationships with OEMs, began engaging in false and misleading advertisements that claimed to compare AirPro to asTech.

39.     AirPro's founders helped develop the First Gen asTech Device, but have no insider knowledge of the current asTech Device.   However, the AirPro website includes misleading statements suggesting that AirPro does have insider knowledge of the current asTech Device, and thus is qualified to compare the asTech Device with AirPro.  Specifically, on the current AirPro website, immediately preceding a false and misleading chart "comparing" asTech and AirPro, the following statement appears:

> Many ask us "*What's the difference between the AirPro & Astech*?"  The founders of AirPro (Lonnie Margol & Chuck Olsen) were also the inventors and founders of the Astech device back in 2010.  They were committed to address the shortcomings of the Astech aftermarket communications device by developing the AirPro OEM compliant scan-tool to meet the needs of body shops confronted with the continuously evolving technologies of today's vehicles.

40.     AirPro therefore presents its false and or misleading statements about the asTech Device as "facts" of which AirPro has inside knowledge.  However, the current asTech Device is completely different from the First Gen asTech Device, a fact that was heavily publicized in the marketplace.   Given their experience in the industry, AirPro's executives know or reasonably should know that the asTech Device is very different from the First Gen asTech Device that they created.  By referencing their knowledge of the First Gen asTech Device, and then making false and/or misleading representations about "asTech" generally, AirPro is purposefully misleading current and prospective customers.

KAI007963

41.     After falsely suggesting that AirPro has insider knowledge of the asTech Device, the AirPro website proceeds to make numerous false and/or misleading representations regarding asTech (screenshots of which are attached hereto as Exhibit A), including, without limitation:

a.     The website claims that, unlike AirPro, asTech does not provide "Evergreen Warranty   Tool Replaced When Hardware Improvements are Made at No Cost" (Ex. A at pp. 2, 7, 13, & 16) despite the fact that asTech in fact does *not* charge customers for updates or to replace a faulty device;

b.     The website purports to list "Scan Results" that show that the asTech Device "missed an Airbag safety system code" and "missed code C1280 engine circuit malfunction" without explaining what factory tools were used (if any), what car was "tested," what version of the asTech device was used for the test, or any other circumstances supporting AirPro's claim that the asTech Device "missed" trouble codes.  This purported "test" falsely suggests that the asTech Device misses codes, a claim that is not substantiated, and is contradicted by asTech's own testing (*id.* at pp. 3–4, 14, & 18);

c.     The AirPro website states: "From the time of submission of a scan request, our technicians will remote into the AirPro attached to the vehicle within 10 minutes." (*Id.* at pp. 2, 5, 13, & 15.)  But, given the inconsistency in incoming service requests from repair shops and the variation by make and model, it would be mathematically impossible to have a technician always remote into the vehicle within 10 minutes;

d.     The AirPro website states: "Because of the fluctuations in internet connectivity, Astech [sic] is limited in its ability to remotely perform many ADAS calibrations." (*id.* at pp. 7 & 15) and has a "limited" ability "to Program and Flash Modules In-house" (*id.* at p. 2.).  This is literally false.  asTech has the capability to perform ADAS calibrations and to program modules on vehicles listed in its coverage chart. asTech deliberately chooses not to perform ADAS calibrations remotely in situations where the shop technician has not been properly trained and the shop does not have the approved OEM targets and the physical space required to conduct

11

KAI007964

the calibration procedure. Any attempt to do otherwise could result in a mis-calibration, which in turn could cause serious harm or even death to the vehicle owner following a repair;

e.   The AirPro website states: "The asTech device is NOT a scan-tool . . . Scan-tool functions and capabilities are reduced to less than their original design when converted and transmitted in this manner [i.e., using asTech's method]." (*Id.* at p. 8.) This was an issue with the First Gen asTech Device marketed by Margol and Olsen. AirPro has no basis to make this claim with respect to the new asTech Device. asTech (along with many other online businesses) is able to address latency issues;

f.   The AirPro website includes the graphic labeled "Truth Campaign," which purports to compare asTech and AirPro, and falsely states that AirPro has full OEM factory scanning capabilities because of the "OEM Scan Tool Software Applications resident directly on the AirPro Tool" (*id.* at pp. 10 & 12.) This too is literally false. Not all OEMs provide the ability to download OEM diagnostic software, and upon information and belief, these software applications are not all resident directly on the AirPro Device;

g.   The AirPro website comparison chart lists various asTech capabilities in red as "Unknown" (the same color used where a device supposedly does not have the capability), and then lists "Yes" for the same capabilities for AirPro in green (*id.* at p. 13), misleading consumers into thinking that the asTech Device does not offer the "Unknown" features, when in fact asTech has all of the listed capabilities.

42.   AirPro's false and/or misleading claims are not only damaging to asTech, but they recklessly endanger the consuming public, as they misrepresent the true capabilities and limitations of the AirPro device and the asTech Device.

43.   On April 3, 2019, asTech sent a cease and desist letter to AirPro regarding its false and misleading statements on its website.

12

KAI007965

44.     In response to the letter, AirPro again further escalated its targeting of asTech. Instead of making an attempt to resolve the dispute or modifying its false claims, AirPro sought to further damage asTech's reputation and business relationships.  AirPro responded by distributing PDF copies of the false representations on the AirPro website, along with asTech's cease and desist letter and AirPro's self-serving response, to untold dozens of AirPro and asTech customers, OEMs, and other industry participants, including media outlets.  With this packet, AirPro included a cover letter (attached hereto as Exhibit B) that both doubled down on its original false claims and added new misstatements.  That letter reads, in full:

Dear Industry Leader,

At AirPro Diagnostics we believe in the American values of honesty and fair play.  We believe that the free market will choose the best products based on performance.  Companies that stoop to besmirch their competitors using false and misleading information show poor judgement and frankly, we consider it un-American.

Astech and its staff have continued to distribute both verbally and in written format documents which negatively speak to AirPro Diagnostics abilities, our tool and services.  Many of you have seen or heard of these false claims and have either informed us and/or forwarded the information to us.  FAKE NEWS!

We have repeatedly offered, in writing, to perform an independently monitored side-by-side comparison between our tools, methods and services to which Astech has failed to respond.

Attached is a Cease and Desist document from asTech to AirPro along with our response and the reference comparison chart from our website's "Truth Campaign".  We firmly stand by our statements on our website and in this formal response.

The industry must ask this simple question; why has AirPro been approved by OEMs that have not approved asTech?  We all know asTech claims to utilize OEM scan tools in their service centers.  What some OEM engineers have uncovered was that the methodology by which the asTech obtains and translates the OEM code for transferring back and forth across the internet, opens opportunities for failure due to delayed responses and/or dropped data packets.

This is a critical matter of passenger safety and reliable consistent services.

We stand by our offer and challenge to allow a disinterested third party to test our system and services against the astech system.

Know the Facts; Know the Truth!

Please contact us with any questions or comments you may have.

Sincerely,

**Chuck Olsen, on behalf of Team AirPro**

45.     AirPro is correct that "[t]his is a critical matter of passenger safety and reliable consistent services."  AirPro's accuracy ends there, however.  It is AirPro, *not* asTech, who

13

KAI007966

endangers these objectives through its insistence on making and publishing factually unsupportable claims.

46. Of particular note, it is misleading to assert "some OEM engineers have uncovered . . . that the methodology by which the asTech obtains and translates the OEM code for transferring back and forth across the internet, opens opportunities for failure due to delayed responses and/or dropped data packets." (Ex. B at p. 1.) asTech (like many other businesses that use the internet) is able to address the latency issues inherent in the internet and still provide consistent and reliable functionality.

47. Moreover, by essentially telling asTech's customers that asTech is a liar and implying that asTech endangers passenger safety, AirPro is irreparably harming asTech's reputation and its customer relationships. By continuing to publish such damaging statements, AirPro is highly likely to continue to cause asTech ongoing and irreparable harm. AirPro's false and misleading publications have already infected the automotive market. On information and belief, a number of OEMs have begun to question asTech's capabilities based on false representations made by AirPro.

48. In addition, asTech has received multiple inquiries from customers regarding AirPro's false statements. For example, on or about April 11, 2019, one of asTech's largest customers inquired about asTech's purported lack of approval by OEMs due to AirPro's false and misleading statements.

49. As a result of these inquiries and AirPro's false advertising, asTech has been forced to incur significant expense and spend a substantial amount of time and money attempting to correct the misimpressions created by AirPro's misleading statements.

14

KAI007967

50.     At least four of asTech's customers have begun using the AirPro Device in lieu of the asTech Device in 2019, upon information and belief because they were enticed by AirPro's false statements regarding its capabilities compared to asTech's.  Overall, asTech's analysis indicates that approximately 5% of asTech's lost accounts have gone to AirPro.  The true customer loss is likely higher, as asTech customers may read AirPro's false and misleading statements and decide to switch to a different provider other than AirPro.  In a recent survey, 25% of all of asTech's non-AirPro losses nationwide occurred in the State of Texas, which suggests a concerted effort by AirPro to disparage asTech in its home state of Texas.

## V.     COUNT ONE: FALSE ADVERTISING IN VIOLATION OF THE LANHAM ACT 15 U.S.C. § 1125(a)

51.     asTech incorporates by reference the allegations in paragraphs 1 through 50 of this Complaint as if fully set forth herein.

52.     AirPro has made false and/or misleading statements, including, without limitation, the statements described in Paragraphs 1-50, in commercial advertisements, presentations and promotional materials, in violation of the Lanham Act, 15 U.S.C. § 1125.

53.     The statements made by AirPro were directed to asTech's actual or potential customers, automobile-repair professionals, and end users of automobile scanning services, all of whom make purchasing decisions with respect to those scanning services.  The members of the public to whom AirPro's statements were directed comprise a substantial segment of asTech's actual or potential customers.

54.     The statements made by AirPro have deceived or are likely to deceive actual or potential customers regarding asTech's scanning services, AirPro's scanners, and the products' comparative capabilities.

15

KAI007968

55.     The statements made by AirPro have materially influenced and likely will materially influence purchasing decisions in part because current or prospective customers, including automobile-repair professionals, are led to incorrectly believe that, among other things, AirPro's scanners have superior capabilities, design, and outcomes when compared to asTech's scanning services, causing current or prospective customers to choose AirPro's scanners instead of asTech's scanning services.

56.     The false and misleading advertising claims have resulted and likely will result in the loss of goodwill and the loss of current and prospective customers who, but for the false and misleading advertising claims made by AirPro, would have conducted business with asTech.

57.     AirPro's and asTech's products are sold in interstate commerce.

58.     The statements made by AirPro were placed into interstate commerce through AirPro's website and distributions to members of the automobile industry in multiple states, and communicated directly to asTech's customers and potential customers throughout the United States.

59.     AirPro knew its commercial advertisements and promotional materials were false and/or misleading or acted with intent to deceive or in reckless disregard of the truth of such statements.

60.     As a direct and proximate result of AirPro's conduct, asTech has suffered and will continue to suffer irreparable injury, including, without limitation, loss of goodwill, damage to reputation, and actual and likely diversion of sales.

61.     As a direct and proximate result of AirPro's conduct, asTech has incurred and will likely continue to incur actual damages, entitling asTech to injunctive relief, corrective advertising,

16

KAI007969

retraction of the false statements made by AirPro, treble damages, and attorneys' fees and costs and the profits derived from the unlawful acts of AirPro.

## VI.    COUNT TWO: BUSINESS DISPARAGEMENT

62.    asTech incorporates by reference the allegations in paragraphs 1 through 61 of this Complaint as if fully set forth herein.

63.    AirPro has published disparaging written statements about the asTech Device and asTech's related services.   AirPro's statements were made directly to asTech's customers, prospective customers, and OEMs throughout the industry, as well as disseminated through AirPro's interactive website.

64.    AirPro's website is integral to its business, and customers are required to access that website and log into AirPro's cloud-based system in order to submit scan requests, obtain scan reports, and download invoices.  Thus, each time an AirPro customer or any prospective customer accesses the website, they are confronted with AirPro's disparaging representations about asTech and the asTech Device.

65.    AirPro has also made oral statements directly to customers, prospective customers, and OEMs regarding the asTech Device.

66.    The statements were disparaging because they cast doubt on the quality of the asTech Device, its capabilities, and the accompanying warranties.  AirPro accomplishes this by making direct statements about asTech's Device as well as by "comparing" the AirPro Device side-by-side with the asTech Device and making a variety of statements about the products' comparative qualities or capabilities.  (*See generally* Ex. A.)  An entire comparison table on AirPro's website is dedicated to establishing that the asTech Device is an "aftermarket communications device" with various "shortcomings," which AirPro's founders were committed

17

KAI007970

to addressing with their own product. (*See* Ex. A at pp. 2 & 13.) Throughout, AirPro makes a variety of misleading statements, including that the asTech Device does not cover current model year vehicles and "misses" various safety system codes. (Ex. A at pp. 2–4, 8, 13–15, & 18.) The gist of this campaign is clear: the asTech Device is purportedly deficient in so many material respects that it is unable to fulfil one of its most important functions—identifying safety system failures to ensure passenger safety. (*See id.*; *see also* Ex. B at p. 1.)

67.     AirPro's statements create a substantially false and disparaging impression by omitting material facts and juxtaposing other facts in a misleading way. For instance, AirPro states that the methodology used by asTech "opens opportunities for failure due to delayed responses and/or dropped data packets." (Ex. B at p. 1.) Though it is true that some latency is an inherent characteristic of the internet in general, the statement is misleading in its description of the impact of that inherent latency on the operation of the asTech Device. To be sure, asTech (like a wide variety of manufacturers whose products transmit information over the Internet, including Tesla, which regularly releases "over-the-air" updates to its vehicles) has developed technology that accounts for and addresses these occasional latency issues without compromising the overall functionality of the device.

68.     The context of these statements demonstrates that AirPro intends to cast doubt on the quality of the asTech Device by calling into question the tool's ability to perform its most basic function: identifying safety system failures. (Ex. A at pp. 3–4, 9, 14, & 18; *see also* Ex. B at p. 1.) These statements further demonstrate an intent to paint asTech as an unethical competitor within the industry and a company with whom OEMs and customers should sever ties.

69.     The statements concern asTech's economic interests because the statements go to the heart of asTech's character as a business, its trustworthiness, and the quality of its product.

KAI007971

These statements not only directly bear on the core functionality and purpose of the asTech Device but also inform customers that the asTech Device's alleged shortcomings pose "a critical matter of passenger safety and reliable consistent services."  (Ex. B at p. 1.)

70.     AirPro published these statements with malice.  AirPro knew the statements in question were false, acted with reckless disregard for whether the statements were true, acted with ill will, and intended to interfere with asTech's economic interests.

71.     AirPro's false statements have caused injury to asTech, resulting in special damages.  asTech has been required to expend time, resources, and money in order to resolve this misunderstanding, and OEM and customer business relationships have been threatened or materially harmed.    These direct pecuniary losses are attributable to AirPro's false communications because, on information and belief, those false statements have played a substantial part in damaging asTech's reputation in the industry.

72.     Additionally, asTech has been required to undertake significant expenses to counteract AirPro's false and misleading publications.

## VII.    COUNT THREE: INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS AND CONTRACTS

73.     asTech incorporates by reference the allegations in paragraphs 1 through 72 of this Complaint as if fully set forth herein.

74.     Upon information and belief, AirPro has interfered with asTech's prospective business relationships with its customers and OEMs by making false and disparaging statements that have caused customers and/or OEMs not to enter into business relationships with asTech.

75.     Moreover, asTech has ongoing business relationships with various customers and/or OEMs.  Upon information and belief, AirPro also knows of asTech's ongoing business relationships with its customers and/or OEMs and has intentionally interfered with those

19

KAI007972

relationships by making false and disparaging statements directly or indirectly to customers and/or OEMs.

76. AirPro's actions in publishing these statements is independently tortious because, as described in Paragraphs 1-72, those statements are false, disparaging, and defamatory, regardless of the effect those actions have on asTech's prospective business relationships with prospective and longtime customers and OEMs.

77. Those defamatory and disparaging statements have prevented asTech from successfully developing its business relationships with certain would-be customers.

78. Similarly, upon information and belief, the defamatory and disparaging statements have caused several existing customers to sever their ongoing business relationships with asTech. Various customers did not renew their agreements with asTech going forward.

79. AirPro acted with a conscious desire to prevent these business relationships from occurring because AirPro has engaged in a targeted campaign to impugn asTech's credibility and prevent members of the industry from dealing with asTech. AirPro further communicated these defamatory statements directly to asTech's and AirPro's customers, which demonstrates a specific effort to convince those customers and prospective customers not to deal with asTech.

80. Additionally, AirPro knew the interference was certain or substantially certain to occur as a result of its conduct. The automotive industry is particularly concerned with passenger safety, and AirPro's disparaging statements bear directly on that safety issue. (*See, e.g.*, Ex. B at p. 1.)

81. asTech has suffered actual harm or damages as a result of that interference because asTech has lost the ongoing business of several customers and has had other prospective customers

KAI007973

reconsider engaging in business with asTech after receiving AirPro's false and misleading publications.

## VIII.   COUNT FIVE: DEFAMATION

82.     asTech incorporates by reference the allegations in paragraphs 1 through 81 of this Complaint as if fully set forth herein.

83.     AirPro has intentionally published statements to various customers and members of the industry directly, as well as indirectly by sending those statements to industry media outlets and publishing the same statements on its interactive website.  All of these statements are unambiguously defamatory based on the context.

84.     The statements made by AirPro refer to asTech and the asTech Device by name. AirPro's website contains an entire segment devoted to its so-called "Truth Campaign," which has the express goal of exposing "the difference between the AirPro & Astech [sic]."  (Ex. A at p. 1.)

85.     These statements expressly or impliedly asserted facts that are objectively verifiable, such as AirPro's misleading side-by-side comparison charts, which make a variety of statements about the products' qualities that are objectively verifiable.  (*See generally* Ex. A.) Such statements include whether the asTech Device covers current model year vehicles or "misses" various safety system codes.  (Ex. A at pp. 2  5, 8, & 13–15.)

86.     AirPro's statements involve a matter of public concern because the statements directly implicate customer safety in the automobile industry.  AirPro has specifically warned customers that the asTech Device's alleged shortcomings pose "a critical matter of passenger safety and reliable consistent services."  (Ex. B at p. 1.)

87.     AirPro's written statements are also libel per se as defined by Texas Civil Practice and Remedies Code section 73.001.  In particular, AirPro's statements impeach asTech's honesty,

KAI007974

integrity, virtue, or reputation by either directly stating or indirectly implying that the asTech Device is not only woefully inadequate for its intended purpose, but also poses a significant safety risk to passengers. (Ex. B at p. 1.) AirPro further posits that asTech's attempts to "besmirch their competitors," using allegedly "false or misleading" information, "show[s] poor judgment" and is "un-American." (Ex. B at p. 1.) These statements are reasonably calculated to produce such results. Not only do they imply that asTech knowingly or intentionally disregards passenger safety in developing and promoting the asTech Device, but that asTech engages in unethical business practices or even fraud in an effort to gain an unfair advantage over AirPro.

88.    AirPro's written statements are defamatory per se under the common law because it has injured asTech in its occupation. Among other things, AirPro alleges asTech has made misrepresentations to customers and OEMs in the industry regarding the capabilities and methodology of the asTech Device as well as spread false or misleading information about the AirPro Device.

89.    AirPro published these statements with actual malice. AirPro knew the statements in question were false based on its experience with asTech in the past and its experience in the industry today. AirPro is aware that omitting certain facts from its statements and graphics could leave a reader with a substantially false impression. Upon information and belief, AirPro also purposefully avoids the truth by refusing to consult sources that can objectively verify the truth of its statements. At the very least, AirPro is negligent in determining whether the statements are true.

90.    AirPro's false statements are defamatory per se, which entitles asTech to a presumption of general damages.

22

KAI007975

91.     Additionally, AirPro's false statements directly and proximately caused injury to asTech.  As a result, asTech has suffered various general damages, including injury to asTech's character and reputation within the industry.

92.     Further, AirPro's false statements directly and proximately caused injury to asTech, resulting in various special damages, including loss of earning capacity and loss of past and future income.  asTech has also been required to undertake reasonably necessary measures to counteract AirPro's defamatory statements to customers and OEMs.

## IX.     COUNT SIX: EXEMPLARY DAMAGES

93.     asTech incorporates by reference the allegations in paragraphs 1 through 92 of this Complaint as if fully set forth herein.

94.     As described in Paragraphs 1-92, AirPro has engaged in a months' long campaign of falsehoods with the express intent of causing substantial harm to asTech's business by poisoning asTech's relationships with OEMs and customers as well as by disparaging asTech's reputation within the industry as a whole.

95.     asTech's injuries have resulted from AirPro's malice, which entitles asTech to exemplary damages under Texas Civil Practice and Remedies Code section 41.003(a)(2).

## X.     JURY DEMAND

96.     asTech hereby demands a trial by jury as provided by Rule 28(a) of the Federal Rules of Civil Procedure as to all issues or claims for which a jury trial is allowed.

## XI.     PRAYER

WHEREFORE, asTech respectfully requests entry of judgment in its favor and against AirPro as follows:

23

KAI007976

A.    For judgment in favor of asTech and against AirPro on all of asTech's claims, including that Defendant has engaged in false advertising, tortious interference with business relations, libel, and business disparagement;

B.    For a preliminary and permanent injunction prohibiting AirPro and each of its officers, agents and servants, employees, attorneys, and all others in active concert of participation with them, pursuant to Rule 65 of the Federal Rules of Civil Procedure and 15 U.S.C. § 1116(a), from making false or misleading statements regarding the asTech Device and AirPro Device, including, without limitation, all statements set forth in Paragraphs 1-92 of this Complaint and set forth in the "AirPro vs. asTech" page on the AirPro website, and requiring AirPro to retract its false and misleading statements;

C.    For an award to asTech of the damages it has suffered, including the costs of corrective advertising and/or profits wrongfully obtained by AirPro, as a result of AirPro's wrongful conduct, in an amount to be determined by the trier of fact;

D.    For enhanced damages and/or profits awarded to asTech pursuant to 15 U.S.C. § 1117(a) and other applicable law according to proof at trial;

E.    For asTech's reasonable attorneys' fees, costs, expenses, and interest pursuant to 15 U.S.C. § 1117(a) and other applicable law;

F.    Exemplary damages;

G.    Prejudgment and postjudgment interest;

H.    Court costs; and

I.    For such other and further relief as this Court may deem just and appropriate.

24

KAI007977

Dated: April 15, 2019                    Respectfully submitted,

                                         MᴄGᴜɪʀᴇWᴏᴏᴅs LLP

                                         By: /s/ Yasser A. Madriz
                                              **Yasser A. Madriz**
                                              *Attorney-in-Charge*
                                              Texas Bar No. 24037015
                                              Southern District of Texas Bar No. 39080
                                              JPMorgan Chase Tower
                                              600 Travis Street, Suite 7500
                                              Houston, TX 77002-2906
                                              Telephone:  (832) 255-6361
                                              Facsimile:  (832) 214-9931
                                              E-mail:  ymadriz@mcguirewoods.com

*Of Counsel:*

**Lucy J. Wheatley** *(pro hac vice pending)*
Virginia Bar No. 77459
**Heidi E. Siegmund** *(pro hac vice pending)*
Virginia Bar No. 89569
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
Telephone:  (804) 775-1000
Facsimile:  (804) 775-1061
E-mail:  lwheatley@mcguirewoods.com
E-mail:  hsiegmund@mcguirewoods.com

**Siobhan K. Ray**
Texas Bar No. 24090346
Southern District of Texas Bar No. 2451020
JPMorgan Chase Tower
600 Travis Street, Suite 7500
Houston, TX 77002-2906
Telephone:  (713) 353-6662
Facsimile:  (832) 214-9927
Email:  sray@mcguirewoods.com
Email:  mindest@mcguirewoods.com

                            *Counsel for Plaintiff Repairify, Inc. d/b/a asTech*

KAI007978